**PACIFIC DOCK & TERMINAL CO. v. LOS ANGELES DOCK & TERMINAL CO.***
**et al.**
**No. 6337.**

Circuit Court of Appeals, Ninth Circuit.
May 25, 1931.

*Rehearing denied July 22, 1931.

Gregory, Hunt & Melvin, T. T. C. Gregory, William H. Hunt, and Wallace Sheehan, all of San Francisco, Cal., and Farrand & Slosson and Leonard B. Slosson, all of Los Angeles, Cal., for appellant.

Walter M. Campbell and Anderson & Anderson & Sheahan, all of Los Angeles, Cal., for appellee.

Before RUDKIN, WILBUR, and SAWTELLE, Circuit Judges.

WILBUR, Circuit Judge.

This action was brought by the appellant, hereinafter referred to as the Pacific Company, assignee of D. M. Reynolds, to compel the conveyance to it of 75 acres of land in the Long Beach Harbor district, and to have the court determine the amount of money by way of damages that should be paid by the appellant to the defendant Pacific Southwest Trust & Savings Bank, hereinafter referred to as the Trust Company, for the appellee, the Los Angeles Dock & Terminal Company, hereinafter referred to as the Los Angeles Company, as a condition precedent to such conveyance in view of the admitted breach of an agreement by the appellant to construct a blast furnace for the manufacture of pig iron upon or adjacent to such land and within the city of Long Beach.

The principal question involved in the case is the proper construction of the terms of a separate agreement accompanying the delivery in escrow of a deed of such land from the appellee, Los Angeles Company, to the Trust Company, in the light of contemporaneous agreements between the parties and of surrounding circumstances. The trial court was very liberal in permitting evidence of oral and written negotiations between the parties leading up to the execution of the agreements referred to, at one time stating, in reply to an objection, " * * * this is an information gleaning process and a good deal has been admitted that, of course, is not very material. So the witness may answer." It is claimed by the appellant that much of this evidence was inadmissible for the purpose of interpreting the written agreements, and that such evidence should have been excluded upon the ground that the written agreements themselves superseded all previous negotiations, written or oral. Cal. Civ. Code, § 1625. The assignments of error do not quote the full substance of the evidence objected to as required by our rules (Rule 3); hence, the error in the admission of this testimony cannot .be considered, although appellant's brief. contains frequent assertions that such evidence was improperly admitted over its objections. For this reason we will approach the problem presented by the record with a view of ascertaining the intent of the parties from the written agreements if it can be done without the aid of such testimony as to the negotiations between the parties. The agreement above referred to is as follows:

"Pacific-Southwest Trust and Savings Bank,
"Los Angeles, California.

"Gentlemen:
"Enclosed herewith find a deed from Los Angeles Dock and Terminal Company to you bearing date the 19th day of December, 1924, conveying certain real property in the City of Long Beach, County of Los Angeles, State of California, and containing 75 acres, more or less.

"This title you shall hold in trust until July 8, 1927 (unless any liens on said property shall in the meantime have been foreclosed and such title divested), at which time you shall sell the same, or so much thereof as may be necessary to realize the amount of five hundred thousand ($500,000) dollars, and shall pay said five hundred thousand ($500,000) dollars to the Los Angeles Dock and Terminal Company, and shall reconvey the remaining lands, if any, to Pacific Dock and Terminal Company, a corporation, as successor in interest to D. M. Reynolds.

"Upon receiving from Pacific Dock and Terminal Company, a corporation, either—

"1. Contracts of sale upon lands formerly owned by Los Angeles Dock and Terminal Company on Long Beach Harbor, with payments still to be made thereon of at least seven hundred fifty thousand ($750,000) dollars, provided, however, that at the time said contract shall be offered for the purposes hereof the entire purchase price of two million ($2,000,000) dollars shall have been paid to Los Angeles Dock and Terminal Company under contract of sale between said company and D. M. Reynolds, now assigned to said Pacific Dock and Terminal Company, a corporation.

"2. A conveyance of lands formerly belonging to Los Angeles Dock and Terminal

Company and by it conveyed to Pacific Dock and Terminal Company, a corporation, as successor in interest to D. M. Reynolds, having a value at the time of the conveyance to you of not less than seven hundred fifty thousand ($750,000) dollars, according to the release prices set forth in the agreement by and between Los Angeles Dock and Terminal Company and D. M. Reynolds, under which this trust is created, a copy of which agreement with amendments thereto is hereto attached and made a part hereof.

"3. Upon the deposit of sufficient securities of the reasonable market value of not less than seven hundred fifty thousand ($750,000) dollars you shall convey said property to Pacific Dock and Terminal Company, holding the substituted security for the purposes hereof.

"The value of the securities in the third case above mentioned to be subject to the appraisal and approval of the Pacific-Southwest Trust and Savings Bank, if not agreed to between the parties hereto.

"In the event that Pacific Dock and Terminal Company, its successors or assigns, shall, on or before the 8th day of July, 1927, construct a blast furnace for the making of pig iron at or adjacent to the property described in said conveyance herewith delivered and within the city limits of the City of Long Beach, the said real property described in said conveyance shall be thereupon conveyed to the Pacific Dock and Terminal Company, a corporation, its successors or assigns, in its entirety, and if the same should have been theretofore conveyed upon the substitution of other security, as hereinbefore provided, then the substituted security shall thereupon be conveyed and delivered to said Pacific Dock and Terminal Company.

"It is further provided that said lands, or any part thereof, described in said conveyance, may be used, enjoyed, leased or occupied by the said Pacific Dock and Terminal Company, subject to being divested by enforcement of any liens against the same, but all of said lands shall be subject to the harbor changes provided for in said contract and amendments and to taxes thereon and to costs and expenses of this trust, all of which shall be paid by the said Pacific Dock and Terminal Company.

"These instructions and declaration shall bind and benefit the successors and assigns of the respective parties hereto.

"Los Angeles Dock & Terminal Company.
   "By [signed] C. J. Curtis, President.
   "By [signed] Walter M. Campbell, Secretary.

"Pacific Dock & Terminal Company.
   "By [signed] T. T. C. Gregory, Vice-President.
   "By [signed] Wallace Sheehan, Secretary.

   "Accepted this ——— day of ———, 19——.

"Pacific-Southwest Trust & Savings Bank.
   "By ——————, Vice-President.

"(Endorsed): Filed Jul. 8, 1927. R. S. Zimmerman, Clerk, by L. J. Cordes, Deputy Clerk."

This agreement superseded an agreement dated November 8, 1923, giving similar instructions as to a deed for 100 acres to D. M. Reynolds in place of the later one for 75 acres to the appellant.

It is contended by the appellant that the deed and instructions to the Trust Company provide for the payment of a penalty for failure upon the part of Reynolds or his assignee to construct a blast furnace on or before the 8th day of July, 1927, that therefore, in legal effect, the agreement is one giving security to pay to the appellee, the Los Angeles Company, the amount of actual damages sustained by it because of the failure of D. M. Reynolds and his assignee, the appellant, to construct said blast furnace, and that the amount of this damage should be fixed by the court in accordance with the evidence, and that the evidence showed that the damage suffered by the appellee is only nominal. As an alternative appellant claims that at most the agreement is one for the payment of liquidated damages for such failure and is not valid or enforceable for the reason that there was no damage suffered or in any event if there is an appreciable damage, that such damage is not "incapable of ascertainment," and that therefore the contract is void in so far as it attempts to fix the actual amount to be paid for the breach of the contract. In these contentions appellant relies upon sections 1670, 1671, Cal. Civ. Code, which are as follows:

"§ 1670. Contract fixing damages, void. Every contract by which the amount of damage to be paid, or other compensation to be made, for a breach of an obligation, is determined in anticipation thereof, is to that extent void, except as expressly provided in the next section.

"§ 1671. Exception. The parties to a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."

The appellee takes an entirely different view of the situation, claiming that the $500,-000 mentioned in this agreement is a part of the purchase price of 220 acres of land (of which the 75 acres in question is a part) agreed to be conveyed by the Los Angeles Company to the Pacific Company, and that the agreement in question, above set forth, was an alternative agreement to pay $500,000 or to erect a blast furnace, recognized by sections 1448, 1449, of the California Civil Code, which are as follows:

"§ 1448. Who has the right of selection. If an obligation requires the performance of one of two acts, in the alternative, the party required to perform has the right of selection, unless it is otherwise provided by the terms of the obligation.

"§ 1449. Right of selection, how lost. If the party having the right of selection between alternative acts does not give notice of his selection to the other party within the time, if any, fixed by the obligation for that purpose, or, if none is so fixed, before the time at which the obligation ought to be performed, the right of selection passes to the other party."

The above-quoted agreement was given in connection with and as part consideration for the purchase of 220 acres of land in the Los Angeles Harbor fronting upon channels 2 and 3, and the turning basin of said harbor.

In order to understand the situation presented by the failure of the appellant to build the blast furnace, it will be necessary to state the history of the negotiations and agreements of the parties as shown by the record.

The Long Beach Harbor was made by dredging channels and a turning basin in the tide lands immediately east of the Los Angeles Harbor at a point where, in 1913, the flood waters of the Los Angeles and San Gabriel rivers flowed into the Pacific Ocean. It is sufficient to say that at the time of the floods in 1913 the flood waters of these rivers, heavily laden with silt, emptied into the Long Beach Harbor and filled the channels theretofore dredged by the Los Angeles Company at a cost to it of $850,000, so that they were no longer deep enough for large sea-going vessels. It was necessary, therefore, that these channels be dredged again before the land belonging to the Los Angeles Company was available as water front property, and it was desirable also that the permanence of the harbor be assured by diverting the waters flowing in the two rivers in time of flood so that they would empty into the Pacific Ocean without flowing into the harbor. To accomplish this, large expenditures were necessary.

As early as 1921 the Los Angeles Company granted an option to Isadore B. Dockweiler as trustee for the sum of $2,000,000 and Dockweiler, in pursuance thereof, tendered to the city of Long Beach an option for the purchase of said lands for said amount, such sum to be paid on or before June 1, 1922, from the proceeds of a bond issue by said city. This option was not exercised and is of no importance in this case except as indicating that at that time the Los Angeles Company was willing to sell its Long Beach Harbor property, containing 244.535 acres, including the afore-mentioned 220 acres, for $2,000,000. On April 9, 1923, for the sum of $5,000, D. M. Reynolds was given an option to purchase for $2,000,000 220 acres of the 240 acres previously optioned to the city. D. M. Reynolds at that time was a stockholder in the Los Angeles Company and had entered into negotiations with representatives of the Pacific Company which was thereafter to be formed and the option was secured by representations that the proposed purchaser with whom Reynolds was negotiating was a steel company. Reynolds claims to have represented both sides in this present transaction. The terms and time of payment of the $2,000,000 fixed in the option to Reynolds were as follows: The payment of $100,000 upon the exercise of the option, which was for 30 days; within 90 days thereafter an additional $150,000; nine months thereafter $250,000, the balance at the rate of $100,000 per month, deferred payments to bear interest at the rate of 5 per cent. This option recites that one of the principal considerations for the granting of the option was the representation that the option, if exercised, would be exercised "by a steel company made up, by consolidation, or otherwise, of a number of steel, iron and coal companies and properties, and that a steel plant will be located on said real property to the advantage of other properties owned by the party of the first part in the vicinity thereof; and it is hereby covenanted that this option shall not be transferred or assigned to any person or corporation other than such steel company, without the consent in writing of the party of the first part [Los Angeles Company] first had and obtained."

The option of April 9th provided it could be extended from month to month to July 9, 1923, by the payment of $5,000 per month. On July 9, 1923, this original option was

modified by providing, among other things, that upon the payment of $10,000 the option was to be extended to August 8, 1923, and upon the payment of an additional $10,000 should be further extended to September 8th, and by the payment of an additional $10,000 should be extended to October 8th. The installments on the purchase price were to be paid as provided in the first option of April 9th and were to date from the exercise of the option except that interest was to be paid from July 9, 1923. On the same date, July 9, 1923, D. M. Reynolds, with the consent of both parties hereto, entered into a contract with the city of Long Beach for the development of the harbor and the channels. and turning basin in the immediate vicinity of the property covered by the option. This agreement provided for a change in the lines of channels 2 and 3 and the turning basin in the Long Beach Harbor, and dedicated certain of the land under option for the purposes of a channel therein designated as parcel 1, containing 10.1 acres, and parcel 2, containing .36 acre. It also provided for the filling in of a parcel of submerged land numbered 3 containing 11.80 acres. It was agreed that the city would dredge and maintain parcels Nos. 1 and 2 to a depth of 32 feet, and should deposit the material therefrom in parcel No. 3. It was also agreed that the city should maintain that depth in the channels and turning basin contiguous to the property of Reynolds and would either enter into a contract for said dredging or procure dredges of its own to complete such work. It was also provided as follows:

"Such contract with said dredging operators shall contain a clause permitting cancellation of such contract or contracts after the performance of one-half of such work (including that for which contracts have just been let, amounting to approximately $150,-000) amounting to approximately $250,000, and the first party [City of Long Beach] shall not be obligated to expend in excess of said $250,000 toward the completion of such work until the second party [Reynolds] shall have executed a good and sufficient bond and undertaking in favor of the first party in the penal sum of $250,000, conditioned that such improvement shall be completed within two years thereafter by the second party or that the second party shall undertake to complete such dredging to the amount of said $250,-000; provided, however, that the party of the first part shall not be required to dredge parcels No. 1 and No. 2 or fill in parcel No. 3 or that portion of channel No. 1, to be abandoned, unless and until the consent of the War Department of the United States shall first have been obtained and the completion bond in the penal sum of $250,000 shall have been duly executed.

"6. The party of the second part proposes to construct improvements including one or more blast furnaces and by-product ovens in the manufacture of pig iron for steel-making purposes upon the lands herein described or upon other lands in the Long Beach harbor district and within the corporate limits of the city of Long Beach at a cost of not less than $5,000,000.

"7. It is further agreed that the party of the first part will maintain said turning basin and said channels numbers two and three to a depth of thirty-two feet below mean lower low-water so long as the party of the second part shall maintain and operate blast furnaces and other improvements."

On October 8, 1923, another agreement was entered into between the Los Angeles Company and Reynolds modifying the previous options by extending the option to November 8, 1923, by providing for the payment of $100,000 on exercise of the option, and the second installment of $150,000 ninety days thereafter; but requiring that all other deferred payments should be made at the times and in the amounts fixed by the option of April 9th as modified July 9th "as if said option had been exercised on the 8th day of October, 1923."

On October 16, 1923, Reynolds entered into a supplemental agreement with the city of Long Beach providing that the city would execute contracts with responsible dredging operators or acquire dredges and complete such dredging by January 9, 1926, that the city would dredge an entrance channel direct from the sea or a channel connecting Long Beach Harbor with Los Angeles Harbor at the option of the city; it was provided that the obligation of the city was to be effective only in event that Reynolds should exercise his option to purchase lands from the Los Angeles Company on or before January 9, 1924; it is further agreed that the following provisions should be substituted for the corresponding agreement above quoted in the agreement of July 9th:

"That the party of the second part [Reynolds] proposes, in the event that the Atchison, Topeka & Santa Fe Railroad Company will construct a branch line from a point near Gallup, New Mexico, to the coal areas of the San Juan Basin, and establish

a rate for the transportation of coal to Long Beach harbor at a figure not in excess of $4.50 per net ton, to construct improvements, including one or more blast furnaces, in the manufacture of pig iron for steel-making purposes upon the lands herein described or upon other lands in the Long Beach harbor district and within the corporate limits of the city of Long Beach at a cost of not less than five million ($5,000,000) dollars.

"It is further provided that the second party will execute a good and sufficient bond or undertaking in favor of the first party in the penal sum of two hundred and fifty thousand ($250,000) dollars, conditioned that such improvement shall be constructed within two (2) years thereafter by the second party, or that the second party shall undertake to complete such dredging to the said amount of two hundred and fifty thousand ($250,000) dollars.

"It shall be further provided in said bond or undertaking that where any amount or sum of money shall be obligated or required to be paid under the conditions thereof, that the second party may at its option turn over and convey a title to said land, which it possesses, but free and clear from all taxes, liens and encumbrances, to lands in parcel number three on said map shown as containing 14.941 acres of land, beginning at the easterly end thereof, at the present value of adjoining lands which is hereby fixed for this purpose only at the rate of two hundred fifty ($250) dollars per channel foot, fronting on channel number three and extending in depth to Seventh street and having a frontage on Seventh street in the proportion as the Seventh street frontage of said parcel bears to the frontage of said parcel on channel number three, or 1000/1508ths, in discharge of such obligation.

"It is further provided, however, that if at the end of said period of two years the said plant should be in substantial course of construction, but not completed; that a reasonable time thereafter shall be permitted for such completion before such forfeiture shall become operative."

It will be observed that by this instrument D. M. Reynolds, plaintiffs' assignor, obligated himself to either construct "one or more blast furnaces in the manufacture of pig iron for steel-making purposes," etc., valued at $5,000,000, or to pay half the expense of dredging the harbor, amounting to $250,000; that this agreement was to be secured by the conveyance of about ten acres of the land under option to appellant, having an estimated value of $250,000, in lieu of a bond, if so desired.

On November 8, 1923, a new option replacing all prior options was given Reynolds by the Los Angeles Company, requiring the payment of $100,000 on that day to exercise the option. This agreement expressly refers to and cancels previous agreements. The essential portions of this agreement are as follows:

"Now, therefore, this agreement witnesseth:

"(1) That said agreements of April 9th, July 9th and October 8th, all of the year 1923, are hereby cancelled, and that the rights and obligations of the respective parties in respect to the real property herein designated shall be as in this agreement set forth, and not otherwise.

"(2) That the party of the second part now has, and the party of the first does hereby confirm and grant to the party of the second part the option to purchase the real property hereinafter described by payment of two million ($2,000,000) dollars to the party of the first part as follows: One hundred thousand ($100,000) dollars on or before the 8th day of November, 1923; thereafter and on or before the 8th day of February, 1924, an additional sum of one hundred and fifty thousand ($150,000) dollars shall be due and payable, and thereafter and on or before July 8th, 1924, an additional sum of two hundred and fifty thousand ($250,000) dollars shall be due and payable, with interest upon the purchase price at the rate of five (5) per cent per annum, payable quarterly from July 9th, 1923, and the further consideration mentioned and secured by the trust agreement this day entered into by the parties hereto. * * *

"The title to the westerly one hundred acres of Tract No. 1 mentioned above shall be conveyed by the party of the second part to and held by the Pacific-Southwest Trust & Savings Bank, as trustee, under trust agreement to be contemporaneously executed by the parties hereto.

"(4) At the time of the delivery of said deed the said party of the second part or his assigns, as hereafter mentioned, shall execute and deliver to the party of the first part a promissory note for one million, four hundred eighty thousand ($1,480,000) dollars. * * * *"

The option provided that Reynolds, upon the payment of $100,000, should be entitled to the possession of all the land mentioned

in the option, including the 100 acres of land described in the original agreement and in the first instructions, dated November 8, 1924, to the Trust Company, and provided that Reynolds could sell any portion of the land covered by the option except said 100 acres, upon the payment to the Los Angeles Company of the entire purchase price fixed for such portion in the agreement, "all to apply upon the installment of the purchase price of two million dollars next becoming due and payable," etc. The agreement further provided for the alteration of the lines of the harbor channels and lots in conformity with the agreement with the city of Long Beach. The option of November 8th then provides for the transfer of the aforementioned ten acres by the Los Angeles Company to a bonding company to secure it for its bond to be given to the city of Long Beach, as above mentioned, to insure the erection of a blast furnace as mentioned above in the agreement between Reynolds and the city of Long Beach, or the payment of $250,000 toward the harbor improvement. This provision is as follows: "It is further provided that upon the exercise of this option the party of the first part [Los Angeles Company] shall cause to be released from its deed of trust securing its present bond issue [$500,000] the easterly portion of Tract No. 3, fronting on Channel No. 3 for one thousand feet and extending in depth to Seventh street, and having a frontage on Seventh street in the proportion as the Seventh street frontage of said parcel bears to the frontage of said parcel on Channel No. 3 [about ten acres] and shall convey the same to a bonding company which shall become surety upon the bond of the party of the second part [Reynolds] in favor of the city of Long Beach for $250,000 under the contract between the party of the second part and said city, which property the said bonding company shall hold in trust until the said party of the second part shall have fulfilled his obligations to said city of Long Beach, and, in the event of the surrender or cancellation of said contract and bond prior to the fulfillment thereof by the said party of the second part, then said real property shall be reconveyed by said bonding company to the party of the first part, but upon the fulfillment of said contract and bond, then said property shall be conveyed to said party of the second part or his assigns."

It will be observed then that this option of November 8th provides that upon the exercise of the option Reynolds shall pay the Los Angeles Company $100,000, that the Los Angeles Company will at once transfer to a bonding company a portion of Tract No. 3 as security to it for its proposed obligation upon a bond to the city of Long Beach, the payment of $250,000 toward the expense of dredging of said channels or the erection of blast furnaces costing approximately $5,000,000; that this land, ten acres, a portion of Tract No. 3 so conveyed, shall be released from a deed of trust of the entire property securing a $500,000 bond issue; that this release would no doubt require a substantial payment to the trustee from the first $100,000 paid by Reynolds to the Los Angeles Company upon the exercise of the option; that immediately upon the exercise of the option to Reynolds the city of Long Beach became obligated to him by its contract with him to go forward with dredging of the Long Beach harbor, estimated to cost $500,000, of which it was to pay $250,000 and Reynolds $250,000, unless Reynolds built the blast furnaces, etc., as agreed, in which event the city was to pay the entire cost of dredging, amounting to $500,000. In short, the Los Angeles Company obligated its property worth $250,000 to either pay $250,000 toward the cost of dredging the harbor or to erect the aforementioned blast furnaces, etc. The appellant, Los Angeles Company, also agreed to convey another 100 acres, included in the option (subsequently decreased to 75 acres, worth about $750,000) described in the above-quoted instructions addressed to the Trust Company, the terms and effect of which agreement we are now considering. It will be observed that at the initial stage of the proceedings that the $250,000 obligation of the Los Angeles Company to the city of Long Beach to build a blast furnace was secured by property of the estimated value of $250,000, while the obligation of the Pacific Company, the purchaser, to it to build a blast furnace was secured by an equity in the 100-acre tract of not more than one-fourth that value, that is, $60,000 at that time. There was no direct agreement on the part of the purchaser to pay more than $2,000,000 for the 220 acres. The agreement to pay the balance of the purchase price thereof specified in the contract as $1,480,000, matured January 8, 1925, while the obligation to build the blast furnace or the steel plant did not accrue until about two years thereafter. At the time of making the final payment of $1,480,000, assuming that the money was paid as agreed and as it actually was in fact paid, the value of the land conveyed to secure to the city upon the conditional obliga-

tion to either pay $250,000 or build a steel plant, was $250,000 plus any increase in value due to the improvements and the value of 75 acres conveyed by the Los Angeles Company was approximately $750,000. It would seem that the purpose of the instructions now under consideration with relation to the 75-acre tract was to protect the Los Angeles Company upon its obligation to pay $250,000 toward the improvement of the harbor arising from a failure of appellant to erect a $5,000,000 blast furnace, etc. Consequently that the damage to the Los Angeles Company from a failure of the appellant to build the blast furnace, etc., would not exceed $250,000 in the event that the city of Long Beach called for that sum under its contract secured by the aforesaid 10-acre tract. Here it should be stated that the freight rate of $4.50 per ton for coal was not obtained, and this made the construction of the blast furnaces economically impractical, hence the general scheme for the erection of a great steel plant, entertained in good faith, was abandoned. The harbor improvements were made by the city, however, and no demand was made upon the parties hereto for any sum as a result of the failure to construct a steel plant or blast furnace. Hence, no damage is claimed by the Los Angeles Company by reason of its agreement with the city to build or cause to be built such a steel plant or blast furnace, which agreement is now secured to the city by property owned by the appellant.

The claim of the appellee is that by the agreements of November 8th the purchase price of land was in effect increased to $2,500,000, subject to rebate in the event appellant built a blast furnace for the manufacture of pig iron. This view seems to us to be inconsistent with the entire framework of the agreements. In the various agreements the purchase price of land is repeatedly stated to be $2,000,000, with installments and times of payment of interest thereon expressly provided. No mention whatever is made in the option agreement of an additional $500,000 to be paid for the land, and the only references to the escrow instructions in such option agreement are those above quoted referring to the trust agreement or escrow instructions as a part of the consideration for the land. Thus, far from saying that the $500,000 mentioned in the trust agreement was a part consideration for the land, as appellee contends, the only purpose of the references thereto apparently was to make plain that the option agreement was the consideration for the escrow instructions or trust

agreement which we have referred to herein as "the instructions to the Trust Company," or vice versa, and to take care of the situation arising upon completion of the payment of the $2,000,000 purchase price because of the lien upon the 100 acres of land covered by the option.

In interpreting the "instructions" under consideration, the resolution passed by the board of directors of the Los Angeles Company on November 2, 1923, authorizing the agreements of November 8th, is significant. It is set forth in the bill, and admitted by the answer, to be as follows: The president and secretary are authorized to enter into a new agreement with Reynolds granting to him option to purchase the property described in the original option at the price of $2,000,000, payable as follows: $100,000 on or before November 8, 1923; $150,000 on or before February 8, 1924; $250,000 on or before July 8, 1924; and $1,480,000 on or before January 8, 1925—"said last named amount being the balance after crediting thereon the $20,000 paid to the company for the original option to purchase said property." It is further provided that when $500,000 had been paid by the purchaser the president and secretary are authorized to convey the property to Reynolds and to take back "a deed of trust to secure the balance of the purchase money." It will be observed that nothing contained in the resolution deals with any other purchase price than the amount of $2,000,000. It was also provided that the president and secretary of the Los Angeles Company were authorized to convey to the Fidelity & Deposit Company of Maryland, on request of the purchaser, the 1,000 feet of frontage hereinabove estimated to have a value of $250,000, said Fidelity & Deposit Company of Maryland to execute a declaration of trust showing that:

It holds said property "in trust for the purpose of conveying the same to the city of Long Beach in the event of a breach of the condition of a bond to be entered into by and between said D. M. Reynolds and the city of Long Beach, or to convey the same to said D. M. Reynolds upon the compliance by the said D. M. Reynolds with the conditions of said bond, or to reconvey the same to this company in the event of the cancellation or surrender of said bond, or its being declared to be invalid prior to the fulfillment of its conditions by the said D. M. Reynolds.

"Be it Further Resolved, that after the execution and delivery of the deed to said D. M. Reynolds or assigns, as provided for

in said agreement and the receipt of the note and deed of trust therein mentioned for the balance of purchase money, the said officers be and they are hereby authorized to enter into a trust agreement with the Pacific-Southwest Trust and Savings Bank, a corporation, and said D. M. Reynolds, or assigns, under which the said D. M. Reynolds shall convey to said bank 100 acres of land described in said agreement, to be by said bank held in trust as security for the payment to this company of $500,000 in the event of the failure of said D. M. Reynolds or assigns to construct a blast furnace for the making of pig iron on or adjacent to the property described in said agreement of option, and within the city limits of the city of Long Beach, on or before July 8th, 1927, with the right to the said D. M. Reynolds to substitute certain other security in lieu of the title to said lands, a draft of which agreement of trust was read and approved by the board of directors on this date. · ° * * ''

According to this resolution the conveyance of the 100 acres (afterwards 75) was to be made at the time of the exchange of deeds between the parties, which was to occur at the time of the payment of $500,000 by appellant to the Los Angeles Company, so that the equity of the purchaser in the 100 acres at that time was somewhat less than half that amount, or less than $250,000. That is to say, the margin of security to the city upon the ten acres deeded to secure the obligation to it was slightly greater than that to the Los Angeles Company for the construction of a blast furnace, etc. In this connection D. M. Reynolds testified that "we" signed a bond with the city of Long Beach and that Mr. Curtis, the president of the Los Angeles Company, wanted the same thing, that is, a bond to pay $250,000 to it "if we didn't build a steel plant." He testified that because of the cost of a surety bond "they worked it out this other way." "We spoke of them both as bonds." "The conversation in substance was that the city of Long Beach had a bond and they wanted one." T. T. C. Gregory, who conducted the negotiations for D. M. Reynolds and the Pacific Company, testified that the Los Angeles Company wanted a bond in the sum of $500,000 and that the final agreement as to that matter was the "escrow instructions" now the subject of our consideration. On the other hand, Walter M. Campbell, secretary of the Los Angeles Company, and its attorney, testified that he told Mr. Gregory that he would not recommend to the Los Angeles Company to eliminate the building of a steel plant unless they would pay $500,000 additional compensation, "to which Mr. Gregory consented." This witness recalls no discussion "about giving any bond to secure this $500,000." This is corroborated by the testimony of Mr. Curtis to the effect that Mr. Campbell "stated that he thought Mr. Gregory's company should pay an additional $500,000 if the steel plant was not built," to which Mr. Gregory replied, "Very satisfactory." Mr. Gregory, in rebuttal, admitted that the proposal was made that his company pay an additional $500,000, but testified that he did not reply that the proposal was satisfactory, nor any words to that effect. This evidence, although received over objection, was incompetent to change or affect the terms of the written agreement between the parties, and was apparently ignored by the trial court in its opinion and findings. This conflict of testimony as to these negotiations serves no purpose in the consideration of this case other than to illustrate the wisdom of the rule excluding such testimony where it conflicts with the written agreement resulting from such negotiations.

We find no indication whatever in any of these agreements that it was intended that the purchaser was to pay $2,500,000 for the property purchased, with a rebate of $500,000 in case it built a blast furnace. The agreements were drawn by competent attorneys after prolonged and detailed negotiations, and nothing could have been simpler than to express such an intent by adding $500,000 to the purchase price, fixing the time of its payment, and the rate of interest thereon, and authorizing a rebate of $500,000 if and when the blast furnace was completed. They had an alternate form of contract before them in the condition of the bond to be given the city. The whole situation of the parties as disclosed by their agreements indicates a purpose to require security from the purchaser to protect the vendor from loss due to a breach of his agreement to erect a blast furnace; that the $500,000 was a penalty and that the condition secured by the conveyance was the agreement to build a blast furnace. Hence, the Los Angeles Company is entitled, within the limits of that penalty, to the actual damage suffered by reason of the failure of the appellant to comply with its agreement, unless, perchance, it should be determined that these damages are so incapable of exact determination that the $500,000 may

be treated as liquidated damages. Both appellant and appellee take the position that if the trust agreement is one of indemnity the damage apprehended and secured against was the depreciation of or damage to the market value of the lands retained by the Los Angeles Company due to the breach of the agreement to erect a blast furnace, etc. The parties directed their evidence to the effect of a blast furnace and of a steel plant upon market value of the land in the vicinity retained by the appellee, the Los Angeles Company, estimated by the trial court to be worth $600,-000. Appellant tried to establish by its evidence that there was no such damage, and the appellee sought to establish by its evidence that there was such damage, but that it was so uncertain that it could not be ascertained, and therefore that the penalty should stand as an agreement to pay liquidated damages expressly authorized in such cases. Upon this question it should be stated that the market value of real estate is practically always capable of exact ascertainment. See discussion in San Diego Land, etc., Co. v. Neale, 78 Cal. 63, 20 P. 372, 3 L. R. A. 83. This does not mean, of course, that it can be readily ascertained. The evidence may be highly complicated and conflicting, the experts may disagree and the estimate of values take a wide range, nevertheless a court or jury is always considered capable of determining the market value of land if it has a market value, and its actual value, if it has not. The damages accruing to the remaining lands of the Los Angeles Company by reason of the breach of the agreement in question is the difference in their market value resulting from the failure to erect the improvements as agreed. However, it has been held that the damage from the failure to drill an oil well in undeveloped territory may be so uncertain and speculative as to justify an agreement for liquidated damages. Escondido Oil & Dev. Co. v. Glaser, 144 Cal. 494, 77 P. 1040; McComber v. Kellerman, 162 Cal. 749, 124 P. 431; Blodget v. Columbia Live Stock Co. (C. C. A.) 164 F. 305; Rispin v. Midnight Oil Co. (C. C. A.) 291 F. 481. These cases, however, are based upon the speculation involved in ascertaining whether or not oil underlies the land subject to the drilling operations, while in the case at bar the agreement is to erect a definite structure on the land for a definite purpose. That the loss of market value of these lands, if any, due to the breach of the agreement to make these improvements is a matter of dispute or a subject of widely varying estimates and opinions, does not mean that damages are incapable of ascertainment within the meaning of the law concerning liquidated damages and that, therefore, the $500,000 may stand as liquidated damages. As the decree cannot be sustained on the theory of an additional alternative consideration for the purchase of the land sold appellant, nor on the theory of liquidated damages, the decree must be reversed.

If the appellee, Los Angeles Company, suffered any damage in the market value of its remaining lands, it can, no doubt, be ascertained upon a new trial. If not, appellee must fail for lack of proof of substantial damage. One of the controverted points in the case is whether the damage to the market value of the Los Angeles Company's remaining land should be determined with relation to the effect thereon of a failure to erect a blast furnace of 100 tons, or one costing five or six million dollars, having a capacity of 600 tons. The question is not important on this appeal, but will arise on a new trial, hence it should be stated that we think appellant is correct in his interpretation of the escrow instructions as to the 75 acres that the blast furnace required to be erected by the escrow instructions under consideration was one of a reasonable size to be commercially operated. If that size were one of 100 tons daily capacity the erection thereof would comply with the contract, although we do not intend to express any opinion on that subject, which is to be determined on a new trial from the evidence adduced thereon. If it is contended on such trial, as it has been on this appeal, that the instructions contemplated a five or six million dollar unit, capable of turning out 600 tons of pig iron daily, it would no doubt require a reformation of the contract as a basis for such contention unless it can be established by the evidence to the satisfaction of the court that a blast furnace of such size and cost is reasonably necessary to economically and commercially produce pig iron. Furthermore, it should be stated that the parties in introducing their evidence upon the last trial called upon the witnesses to assume a plant actively operating and employing many men. There was no doubt a confident expectation by all concerned that the plant so constructed would be so operated, but the agreement under consideration contains no requirement that the plant should be operated at all. The question of the operation of the plant was no doubt purposely left to be determined by the economic situation as it developed, and the effect of the failure of the appellant to erect the plant must be determined in the light of that fact.

Decree reversed, and case remanded for further proceedings not inconsistent herewith.

SAWTELLE, Circuit Judge, concurs.