State ex rel. Jackson v. MV Realty PBC, LLC, 2026 NCBC 2.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
23CV006408-910

STATE OF NORTH CAROLINA, ex rel. JEFF JACKSON, Attorney General,

Plaintiff,

v.

MV REALTY PBC, LLC; MV REALTY OF NORTH CAROLINA, LLC; MV BROKERAGE OF NORTH CAROLINA, LLC; AMANDA ZACHMAN; ANTONY MITCHELL; DAVID MANCHESTER; and DARRYL COOK,

Defendants.

**ORDER AND OPINION ON PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO STRIKE**

**THIS MATTER** is before the Court on Plaintiff State of North Carolina, *ex rel.* Jeff Jackson, Attorney General's Motion for Partial Summary Judgment (ECF No. 165) and Motion to Strike Averments in Declaration of David Manchester ("Motion to Strike," ECF No. 174).

**THE COURT**, having considered the Motion for Partial Summary Judgment, the Motion to Strike, the parties' briefs and exhibits, the arguments of counsel, and all other appropriate matters of record, **CONCLUDES** that Plaintiff's Motion for Partial Summary Judgment should be **GRANTED**, and Plaintiff's Motion to Strike should be **GRANTED** in part and **DENIED** in part. The Court **DEFERS** ruling on Plaintiff's request for an award of restitution and civil penalties until a later date.

*Attorney General Jeff Jackson, by Director of Major Litigation, Consumer Protection Division Brian D. Rabinovitz, Special Deputy Attorney General Keith T. Clayton, and Special Deputy Attorney General Asa C. Edwards, IV for Plaintiff.*

*Saul Ewing Arnstein & Lehr, LLP, by John C. Gekas, Nathan S. Henderson, Angela C. de Cespedes, Jillian C. Postal, Samuel Bordoni-Cowley, Steven Reingold, and Megan Warshawsky; and Young Moore and Henderson, P.A., by Walter E. Brock, Jr., and David W. Earley, for Defendants.*

Davis, Judge.

## INTRODUCTION

1.      Beginning in 2020, the defendants in this case began operating an enterprise in North Carolina in which they persuaded homeowners to sign contracts obligating them to use defendants' agents as their exclusive real estate brokers if they sold their homes within the ensuing forty-year period.  The terms of these contracts purported to allow the defendants to recover monetary penalties against a homeowner who breached the contract by using a different broker.  Defendants also engaged in a pattern and practice of acts designed to create a cloud on the title of participating homeowners in their respective properties.  The State of North Carolina, through its Attorney General, has filed the present action asserting that by operating this enterprise the defendants have engaged in unfair or deceptive trade practices as well as committing other violations of North Carolina law—including violations of existing legal restrictions on telephonic solicitations.

## FACTUAL AND PROCEDURAL BACKGROUND

2.      "The Court does not make findings of fact on motions for summary judgment; rather, the Court summarizes material facts it considers to be uncontested." *McGuire v. LORD Corp.*, 2021 NCBC LEXIS 4, at **1–2 (N.C. Super. Ct. Jan. 19, 2021) (cleaned up).

3.     The Plaintiff in this action is the State of North Carolina, *ex rel.* Jeff Jackson, Attorney General (the "State"), acting pursuant to N.C.G.S. §§ 75-14 and 75-105(a).  (Compl. ¶ 1, ECF No. 2.)

4.     Defendant MV Realty PBC, LLC is a Florida limited liability company and the sole corporate member of Defendant MV Realty of North Carolina, LLC. (2022 Florida Limited Liability Company Annual Report, ECF No. 32.21; MV Realty Operating Agreement, at 13, ECF No. 167.36.)

5.     Defendant MV Realty of North Carolina, LLC is a North Carolina limited liability company that held a North Carolina real estate broker's license until 2023.  (Compl. ¶ 3; Answer ¶ 3, ECF No. 100; North Carolina Real Estate Commission Order dated 13 March 2024, at 13, ECF No. 167.2.)

6.     Defendant MV Brokerage of North Carolina, LLC is a North Carolina limited liability company.  (Compl. ¶ 5; Answer ¶ 5.)[1]

7.     The individual Defendants are current and former owners, officers, and employees of the various MV Realty entities.

8.     Defendant Amanda Zachman founded MV Realty PBC, LLC in 2014 and serves as its managing director and officer.  (Compl. ¶ 8; Answer ¶ 8; 2022 Florida Limited Liability Company Annual Report.)  Zachman also serves as an officer of MV Realty of North Carolina, LLC.  (MV Realty Operating Agreement, at 4.)

---

[1] Throughout this Opinion, the Court often refers to these entities collectively as "MV Realty." At other times, the Court refers to these entities (along with the four individually named defendants) simply as "Defendants."

9.     Defendant Antony Mitchell is the Chief Executive Officer of MV Realty PBC, LLC and an officer of MV Realty of North Carolina, LLC.  (Mitchell Decl. ¶ 1, ECF No. 38.2; MV Realty Operating Agreement, at 4.)

10.    Defendant David Manchester is the Chief Operating Officer of MV Realty PBC, LLC.  (Manchester Decl. ¶ 2, ECF No. 170.1).  Zachman, Mitchell, and Manchester are also members of MV Realty of North Carolina, LLC.  (North Carolina Limited Liability Company Annual Report, Ex. 11, ECF No. 32.11; MV Realty Operating Agreement, at 4.)

11.    Defendant Darryl Cook is a former licensed real estate broker and former employee of MV Realty of North Carolina, LLC, who served as both its Broker-in-Charge and Broker-of-Record.  (Real Estate Commission Order ¶ 5.)[2]

12.    Defendants began marketing a Homeowner Benefit Agreement ("HBA") program to North Carolina homeowners in August 2020.  (Mitchell Decl. ¶¶ 3–6, 9.)

13.    Through the HBA program, MV Realty represented to North Carolina homeowners that it was "offer[ing] a homeowner an immediate cash payment between $300 to $5,000, depending on the value of the homeowners' property.  In exchange, homeowners agree that, if they choose to sell their home during the duration of the program, they will (1) enter into a separate listing agreement; and (2) allow MV [Realty] to be their listing agent."  (Mitchell Decl. ¶ 6.)

---

[2] On 13 March 2024, the North Carolina Real Estate Commission entered Findings of Fact, Conclusions of Law, and an Order (the "Real Estate Commission Order" ECF No. 167.2) in which it determined that Darryl Cook and MV Realty of North Carolina LLC had violated N.C.G.S §§ 93-6(a)(1), (a)(2), (a)(3), (a)(8), (a)(10), and (a)(15).  The Real Estate Commission Order revoked Darryl Cook's real estate broker license and permanently revoked the real estate broker license of MV Realty of North Carolina, LLC.

14.     MV Realty operated websites where it advertised the HBA program to homeowners and requested that homeowners provide their contact information and consent to be contacted by an MV Realty agent about the program. (Mitchell Decl. ¶ 30.)[3] MV Realty also contracted with online lead generators to direct homeowners to its website, thereby maximizing the number of homeowners who would sign up for the program. (Mitchell Decl. ¶ 31.)

15.     An agent of MV Realty would thereafter contact homeowners and offer an incentive payment to the homeowner if they enrolled in the program. (Mitchell Decl. ¶¶ 6, 30–32, 35–36.) If a homeowner responded that they would accept the payment, MV Realty sent a notary to their home along with a copy of an HBA, which consisted of a written contract between the homeowner and MV Realty. (Compl. ¶ 40; Mitchell Decl. ¶ 37.) Absent a specific request from the homeowner, the first time a homeowner was afforded the opportunity to review the terms of the HBA was the day the notary arrived at their home to have them sign it. (Mitchell Decl. ¶ 38.)

16.     The HBA granted MV Realty an exclusive right to serve as the homeowner's listing agent in the event the homeowner decided to sell their home or if title to the home was otherwise transferred. (Sample HBA at 1–2, ECF No. 38.3.) The duration of each HBA was forty years. (Sample HBA at 2.) If a participating homeowner decided to sell their home during the HBA's term, the commission due to MV Realty upon sale would be the greater of 6% of the sale price or the estimated fair

---

[3] As discussed in much more detail later in this Opinion, the State vigorously contends that Defendants have failed to put forth evidence that lawful consent was actually given by the homeowners MV Realty contacted.

market value of the home at the time the HBA was entered into if there was no other cooperating broker. (Sample HBA at 2.) If another broker participated in the sale, the commission due to MV Realty was the greater of 3% of the sale price or 3% of the home's estimated value at the time the HBA was executed. (Sample HBA at 2.) The HBA's terms provided that the agreement would remain binding on the homeowner's heirs upon the homeowner's death during the forty-year term. (*See* Sample HBA at 2.)

17.     If a participating homeowner breached the HBA by, for example, using a different listing agent to sell their home, the HBA provided that MV Realty was entitled to receive an Early Termination Fee ("ETF") in the amount of 3% of the fair market value of the home either at the time the HBA was executed or at the time the HBA was breached—whichever was greater. (Sample HBA at 2.) The HBA further stated that the obligations of program participants "constitute covenants running with the land and . . . shall bind future successors in interest to title to the Property" and that, in the event the HBA was breached, "any amounts owed . . . to [MV Realty] . . . shall be secured by a security interest and lien in and against the Property as security for the amounts owed" under the agreement. (Sample HBA at 3.)

18.     MV Realty provided public notice of a homeowner's participation in the HBA program by recording a document designated as a Memorandum of MVR Homeowner Benefit Agreement ("Memorandum" or "Memoranda") with the Register of Deeds office in the county where the home was located. (Mitchell Decl. ¶ 27.) The Memorandum consisted of one page (plus signature pages for the homeowner and an

MV Realty representative) and did not recite the terms of the HBA or attach the HBA as an exhibit. (Mem. HBA at 11–12, ECF No. 38.3.) Instead, the Memorandum simply contained a brief description of the homeowner's participation in the program and stated that the obligations of the homeowner were "covenants running with the land and bind future successors-in-interest to title to the Property." (Mem. HBA at 11.)

19. The HBA included three exhibits: (1) a "Working with Real Estate Agent'" brochure, (2) a "Payment Authorization Agreement" form, and (3) the above-mentioned Memorandum. (Revis Aff. ¶ 4, ECF No. 39.1.) Although the HBA referenced a sample listing agreement, no such listing agreement was actually attached to the HBA. Instead, the HBA provided a link to a website where MV Realty's standard listing agreement could be downloaded. (Sample HBA at 1.)

20. Approximately 2,100 North Carolina homeowners have participated in the HBA program through the present date. (Compl. ¶4; Answer ¶ 4.)

21. MV Realty's general practice when it suspected an HBA program participant may have breached the HBA was to send the homeowner a letter "remind[ing] the homeowner of their obligations under the HBA and the payments they may be liable for in the event of breach." (Mitchell Decl. ¶ 53.) MV Realty sent at least 67 such letters to homeowners in North Carolina. (Mitchell Decl. ¶ 54.)

22. MV Realty has sought to enforce HBAs by filing a number of lawsuits for breach of contract against North Carolina homeowners who were alleged to have breached their respective HBAs. (Compl., Ex. 19; Compl., Ex. 20; Pls.' Reply Br.

Supp. Mot. Prelim. Inj., Ex. 9, ECF No. 39.9; Pls.' Reply Br. Supp. Mot. Prelim. Inj., Ex. 10, ECF No. 39.10.)

23. When MV Realty filed such lawsuits, it also filed a notice of *lis pendens* against the homeowner's property with the Register of Deeds in the applicable county. (Compl. Ex. 21; Compl. Ex. 22.) In those lawsuits, MV Realty typically requested that the *lis pendens* remain pending throughout the duration of the lawsuit. (Pl.'s Reply Br. Supp. Mot. Prelim. Inj., Ex. 9; Pl.'s Reply Br. Supp. Mot. Prelim. Inj., Ex. 10.)

24. On several occasions when MV Realty believed a homeowner had breached an HBA, MV Realty sent letters "to the buyer[s] of the properties threatening to file suit against the buyer[s] to foreclose its 'lien'." (Compl., Ex. 23.)

25. On 30 March 2023, the State initiated the present action by filing a Complaint in Wake County Superior Court asserting the following claims for relief against Defendants: (1) unfair or deceptive trade practices ("UDTP") pursuant to N.C.G.S. § 75-1.1, *et seq.*; (2) unlawful telephone solicitation practices under N.C.G.S. § 75-100, *et seq.*; (3) unfair debt collection practices pursuant to N.C.G.S. § 75-50, *et seq.*; and (4) usurious lending practices under N.C.G.S. § 24-1, *et seq.* (Compl. ¶¶ 173–99.)

26. This case was designated as a complex business case and assigned to the undersigned on 19 April 2023. (ECF No. 7.)

27. On 18 September 2023, the Court entered a Preliminary Injunction Order (the "PI Order," ECF No. 72) that directed MV Realty to: (1) record

terminations of all Memoranda it had filed regarding the properties of North Carolina homeowners associated with an HBA; (2) file cancellations of all *lis pendens* that it had previously filed on the properties of North Carolina homeowners; and (3) remove any reference to a *lis pendens* from any future legal pleadings associated with an alleged breach of an HBA against a North Carolina homeowner.

28. The PI Order also enjoined MV Realty from:

a. Recording a Memorandum of Homeowner Benefit Agreement ("Memorandum" or, in the plural form, "Memoranda") on the property of any North Carolina homeowner who entered into a Homeowner Benefit Agreement ("HBA") with MV Realty prior to 24 August 2023.

b. Asserting or representing to any North Carolina homeowner, title agent, real estate agent, closing attorney, lender, prospective purchaser, or in any legal action involving a North Carolina homeowner who has signed an HBA, that MV Realty holds any valid lien, security interest, real covenant, or any other encumbrance or cloud on title on the home of any North Carolina homeowner or that MV Realty may recover an Early Termination Fee or liquidated damages from a North Carolina homeowner in connection with an HBA.

c. Recovering or attempting to recover any Early Termination Fee or penalty relating to an HBA signed by a North Carolina homeowner, provided that MV Realty may collect (a) a commission provided for in the applicable HBA in cases in which MV Realty performed its services as a listing agent or cooperating broker as set out in the HBA or the listing agreement; and (b) an administrative fee associated with the performance of the services referenced in subpart (a), but only to the extent that said administrative fee was clearly identified in a listing agreement that was either attached to the HBA signed by the North Carolina homeowner or accessible via a URL link contained in the HBA signed by the North Carolina homeowner.

d. Filing or causing to be indexed a *lis pendens* on a property that is the subject of an existing HBA signed by a North Carolina homeowner.

e. Commencing or continuing to prosecute or maintain any legal action or arbitration proceeding to enforce an Early Termination Fee, lien, security interest, or other encumbrance allegedly arising from an HBA signed by a North Carolina homeowner, except that MV Realty shall be permitted to file a legal action or arbitration proceeding (consistent with the terms of the applicable HBA signed by the North Carolina homeowner) to recover damages for breach of the HBA (or to negotiate a settlement of its claim).

(PI Order, at 2–4.)[4]

29.     On 21 and 22 September 2023, Defendants MV Realty of North Carolina, LLC and MV Realty PBC, LLC filed petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida, Case Nos. 23-17595-EPK and 23-17596-EPK, respectively (the "Bankruptcy Cases").

30.     In conjunction with the Bankruptcy Cases, the Debtor-Defendants initiated an adversary proceeding (the "Adversary Proceeding," AP No. 23-01211-EPK) against the State and other states' attorneys general on 25 October 2023 that addressed issues similar to the claims existing in the present litigation.

31.     On 7 February 2024, the bankruptcy court entered an Order Abstaining From and Dismissing Adversary Proceeding.  (*See* ECF No. 104.)  On 24 May 2024,

---

[4] On 29 September 2023, the Defendants filed a Notice of Appeal as to the PI Order.  (ECF No. 80.)  On 21 August 2024, the North Carolina Supreme Court entered an Order dismissing the appeal and remanding this case to this Court. (ECF No. 125.)

the bankruptcy court entered an Order Dismissing Cases. (Case No. 23-17590-EPK, (Bankr. S.D.Fla. May 24, 2024, Doc. 1523).)

32. In the present Motions, the State seeks partial summary judgment on its UDTP claims and full summary judgment on its Telephone Solicitation Act claims.[5]

33. A hearing was held via Webex on 29 July 2025 at which all parties were represented by counsel. Following the hearing, the parties submitted supplemental briefs at the direction of the Court.

34. The Motions are now ripe for resolution.

### LEGAL STANDARD

35. It is well established that "[s]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018) (quoting N.C. R. Civ. P. 56(c)). "[A] genuine issue is one which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (cleaned up).

---

[5] Because the State is not seeking summary judgment as to its claims for unfair debt collection practices or usurious lending practices, this Opinion does not address those claims.

36.     On a motion for summary judgment, "[t]he evidence must be considered 'in a light most favorable to the non-moving party.' " *McCutchen v. McCutchen*, 360 N.C. 280, 286 (2006) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470 (2004)).  "[T]he party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985).

37.     The party moving for summary judgment may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense . . . or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000).  "If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to 'set forth specific facts showing that there is a genuine issue for trial.' " *Lowe v. Bradford*, 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P. 56(e)).  If the nonmoving party does not satisfy its burden, then "summary judgment, if appropriate, shall be entered against [the nonmovant]." *United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 558 (2017) (quoting N.C. R. Civ. P. 56(e)).

38.     When a party requests offensive summary judgment on its own claims for relief, "a greater burden must be met." *Brooks v. Mt. Airy Rainbow Farms Ctr., Inc.*, 48 N.C. App. 726, 728 (1980).  The moving party "must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with his recovery arise from the evidence, and that there is no standard

that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985). For that reason, it is "rarely . . . proper to enter summary judgment in favor of the party having the burden of proof." *Blackwell v. Massey*, 69 N.C. App. 240, 243 (1984).

## ANALYSIS

39. The State seeks summary judgment on the following portions of its UDTP claims as alleged in the Complaint:

   a. Defendants committed an unfair or deceptive trade practice by recording encumbrances on the residences of North Carolina homeowners that falsely claimed to be covenants that run with the land;

   b. Defendants committed an unfair or deceptive trade practice by filing *lis pendens* against the properties of homeowners that it believed had breached their HBAs; and

   c. Defendants committed an unfair or deceptive trade practice by collecting [ETFs] from North Carolina homeowners under the HBAs despite the fact that such fees constituted unenforceable penalties under North Carolina law.

(Pl.'s Br. Supp. Mot. Summ. J. at 15–31, ECF No. 166.)[6]

40. In addition, the State seeks summary judgment on its Telephone Solicitation Act claims in their entirety based on the following alleged acts by Defendants:

   a. Making of unlawful calls to persons on North Carolina's Do Not Call Registry; and

---

[6] For clarity, the State contends in this lawsuit that Defendants are also liable for UDTP on several other grounds as well but are only seeking summary judgment on the three UDTP theories set out above. Therefore, this Opinion does not address those other grounds for UDTP liability.

> b.  Engaging in automatic dialing and recorded message player violations.

(Pl.'s Br. Supp. Mot. Summ. J. at 31–38.)

41.   The Court will address each of these issues in turn.

## I.   UDTP Claims

42.   N.C.G.S. § 75-14 states as follows:

> If it shall become necessary to do so, the Attorney General may prosecute civil actions in the name of the State on the relation of the Attorney General to obtain a mandatory order, including (but not limited to) permanent or temporary injunctions and temporary restraining orders, to carry out the provisions of [North Carolina's Unfair and Deceptive Trade Practices Act], and the venue shall be in any county as selected by the Attorney General.

N.C.G.S. § 75-14.

43.   In addition, N.C.G.S. § 75-105(a) provides, in pertinent part, that

> [t]he Attorney General may investigate any complaints received alleging violation of this Article.  If the Attorney General finds that there has been a violation of this Article, the Attorney General may bring an action to impose civil penalties and seek any other appropriate relief pursuant to this Chapter, including equitable relief to restrain the violation.

N.C.G.S. § 75-105(a).

44.   The nature of UDTP claims has been summarized by this Court as follows:

> North Carolina law created a private right of action under Chapter 75 as part of its effort to protect consumers from unfair or deceptive trade practices.  *See* N.C.G.S. § 5-1.1 (outlawing unfair or deceptive practices in trade); N.C.G.S. § 75-16 (creating a private right of action and authorizing treble damages); *see also Hardy v. Toler*, 24 N.C. App. 625, 630–31, 211 S.E.2d 809, 813 (1975).  The protections of N.C.G.S. § 75-1.1 extend, in certain circumstances, to businesses as well.  *Dalton v.*

*Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 710 (2001) (citing *United Labs.*, 322 N.C. at 665, 370 S.E.2d at 389).

"[T]o establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711 (citing *Spartan Leasing, Inc. v. Pollard*, 101 N.C. App. 450, 460–61, 400 S.E.2d 476, 482 (1991)). "The Act does not . . . define an unfair or deceptive act, 'nor is any precise definition of the term possible.' " *Bernard v. Cent. Carolina Truck Sales, Inc.*, 68 N.C. App. 228, 229–30, 314 S.E.2d 582, 584 (1984) (quoting *Wachovia Bank & Trust Co. v. Smith*, 44 N.C. App. 685, 690, 262 S.E.2d 646, 649 (1980)). A trade practice "is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 59, 620 S.E.2d 222, 230 (2005) (citing *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987)).

*Charah, LLC v. Sequoia Servs., LLC*, 2020 NCBC LEXIS 52, at *18 (N.C. Super. Ct. Apr. 17, 2020).[7] Our Supreme Court has reiterated that "a practice is deceptive if it has the capacity . . . to deceive." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 72 (2007).

45. It is well established that "[w]hether the alleged conduct constitutes an unfair or deceptive act is a question of law for the court." *Campbell Sales Grp., Inc. v. Niroflex by Jiufeng Furniture, LLC*, 2022 NCBC LEXIS 148, at *33 (N.C. Super. Ct. Dec. 5, 2022) (cleaned up). "The question of '[w]hether a particular act is unfair or deceptive, depends on the facts surrounding the transaction and the impact on the

---

[7] At the 29 July hearing, counsel for Defendants stipulated that the acts at issue were in or affecting commerce. (29 July Hr'g Tr. at 79, line 13.)

marketplace'." *Id.* (quoting *Dealers Supply Co.*, 348 F. Supp. 2d at 577, 591 (M.D.N.C. 2004)).[8]

## A. Recording of Memoranda Falsely Claiming to Contain Covenants That Run with the Land

46. The State contends that Defendants committed an unfair or deceptive trade practice each time they filed a Memorandum with a Register of Deeds office containing the false representation that the HBA referenced in the Memoranda encompassed covenants running with the land, thereby creating a cloud on the homeowners' title.

47. As noted above, each Memorandum consisted of a one-page document that MV Realty recorded with the Register of Deeds after a homeowner executed an HBA. (*See, e.g.*, Compl., Exs. 1, 13, 19, 20.) It referred to a "certain MVR Homeowner Benefit Agreement," included a legal description of the homeowner's property, and stated that the HBA term began as of an "Effective Date" (which was not actually listed in the Memorandum), and "expires on the earlier of: (i) the date the Property

---

[8] On 24 August 2023, Governor Roy Cooper signed into law House Bill 422, "An Act to Prohibit Unfair Real Estate Service Agreements for Residential Real Estate." N.C.G.S. § 93A-88.1, *et seq.* The stated legislative purpose of this law was "to prohibit the use of real estate service agreements that are unfair to an owner of residential real estate or to other persons who may become owners of that real estate in the future" and "prohibits the recording of such residential real estate service agreements so that the public records will not be clouded by them and provides remedies for owners who are inconvenienced or damaged by the recording of such agreements." N.C.G.S. § 93A-88.1. The statute prospectively makes the types of HBAs offered by MV Realty illegal. The statute specifically defines as unfair and void those real estate service agreements that purport to run with the land, create a lien or encumbrance, and have a stated duration of longer than one year. Moreover, violations of the statute are deemed violations of the UDTPA under N.C.G.S. § 75-1.1. (N.C.G.S. § 93A-88.4.) Although House Bill 422 prohibited MV Realty from entering into new HBAs with North Carolina homeowners after its effective date, the new law did not apply retroactively to HBAs previously entered into between MV Realty and North Carolina homeowners.

is sold in accordance with the Agreement, and (ii) the date that is forty (40) years after the Commencement Date (the "Term"), unless otherwise terminated in accordance with its terms." (Compl. Ex. 1.) The Memorandum also stated—in bold, underlined text—that "**the obligations of Property Owner under the [HBA] constitute covenants running with the land and shall bind future successors-in-interest to title to the Property**." (Compl. Ex. 1 (emphasis in original).)

48. MV Realty argues that the recordation of the Memorandum with the local Register of Deeds was permissible pursuant to the broad language of N.C.G.S. § 161-14, which sets out the duties of a Register of Deeds in North Carolina regarding the registration of instruments. N.C.G.S. § 161-14(a) provides that "[a]fter the register of deeds has determined that all statutory and locally adopted prerequisites for recording have been met, the register of deeds shall immediately register all written instruments presented to him for registration." N.C.G.S. § 161-14(a).

49. In *Fleming v. Mann*, 23 N.C. App. 418 (1974), our Court of Appeals stated that "it is not the function of the Register of Deeds to inquire into the substance or the legal efficacy of the documents presented to him for recording. If they are properly acknowledged and probated and if the appropriate fee is tendered, it is his duty promptly to record and index them." *Id.* at 422. The Court of Appeals further held that "any instruments pertaining to real property are included among the documents allowed by law to be registered." *Id.* at 421 (cleaned up).

50.     Nevertheless, there are limits to what may properly be recorded under N.C.G.S. § 161-14(a).  Most notably, N.C.G.S. § 14-118.6 makes it unlawful for

> any person to present for filing or recording in a public record or a private record generally available to the public a false lien or encumbrance against the real or personal property of an owner or beneficial interest holder, knowing or having reason to know that the lien or encumbrance is false or contains a materially false, fictitious, or fraudulent statement or representation.

N.C.G.S. § 14-118.6(a).

51.     Moreover, subpart (d) of the statute states that "the presentation of an instrument for recording or filing with a register of deeds or clerk of superior court that purports to be a lien or encumbrance that is determined to be materially false, fictitious, or fraudulent shall constitute a violation of G.S. 75-1.1."  N.C.G.S. § 14-118.6(d).

52.     The State contends that MV Realty's characterization of the HBA as creating a covenant running with the land that binds successors-in-interest to the property is false.  This is so, the State argues, because the HBA is a contract for personal services that does not meet the legal requirements applicable to covenants that run with the land.

53.     Our Court of Appeals has stated the following:

> Covenants that run with the land are real as distinguished from personal covenants that do not run with the land.  Three essential requirements must concur to create a real covenant: (1) the intent of the parties as can be determined from the instruments of record; (2) the covenant must be so closely connected with the real property that it touches and concerns the land; and (3) there must be privity of estate between the parties to the covenant.

*Cunningham v. City of Greensboro*, 212 N.C. App. 86, 97 (2011) (cleaned up).

54.     Although the State contends that none of these three prongs are satisfied, the Court need only address the second prong.

55.     Our Supreme Court has held that "[w]here the burdens and benefits created by the covenant are of such a nature that they may exist independently from the parties' ownership interests in land, the covenant does not touch and concern the land and will not run with the land." *Runyon v. Paley*, 331 N.C. 293, 300 (1992) (cleaned up). "To touch and concern the land, the object of the covenant must be annexed to, inherent in, or connected with, land or other real property, or related to the land granted or demised." *Raintree Corp. v. Rowe*, 38 N.C. App. 664, 670 (1978) (cleaned up); *see also id.* at 669 ("The provision that the covenant is to run with the land is not binding unless the covenants possess the characteristics of a real covenant.").

56.     Although the "touch and concern" element does not require "that the covenant have a physical effect on the land[,]" it does require that the restriction "affect the legal rights of the covenanting parties as landowners." *Runyon*, 331 N.C. at 300. As a general proposition, a covenant "to pay money [does] not touch and concern the land." *Raintree*, 38 N.C. App. at 670.

57.     Well over a century ago, our Supreme Court held that a real estate listing agreement is a contract for personal services. *See Abbot v. Hunt*, 129 N.C. 403, 404 (1901) ("But we cannot agree that the statute of frauds applies. This is not an action for specific performance, but on a contract for personal services, or for damages on breach of such contract for the value of the services.").

58. The Court concludes that for purposes of this issue the HBA is akin to a listing agreement and therefore is properly deemed to be a contract for personal services as opposed to an obligation that touches and concerns the land.

59. Furthermore, the Court notes that at the 29 July hearing, Defendants' attorney conceded that its recording of the Memorandum did, in fact, constitute a cloud on the title of a homeowner's property.

> The Court: Well, do you acknowledge that the recording of the memorandum constituted a cloud, or at least potentially constituted a cloud on their ownership title?
>
> Mr. Henderson: Your Honor, I would say that it certainly – when you say potentially, undoubtedly, yes, it evokes those concepts.

(29 July Hr'g Tr. at 84, lines 15–20.)

60. For these reasons, the Court concludes that no genuine issue of material fact exists as to whether Defendants committed an unfair or deceptive trade practice each time it filed a Memorandum that falsely claimed to contain covenants that ran with the land. Therefore, summary judgment is **GRANTED** in favor of the State on this issue.

### B. Filing of *Lis Pendens*

61. As noted above, each time MV Realty sued a homeowner for breach of the HBA and sought to recover the ETF, it filed a notice of *lis pendens* with the clerk of court in the county where the home was located. (Compl., Ex. 21.) This notice stated that it was being filed in connection with a lawsuit for breach of contract and that the homeowner's obligation to use MV Realty as their exclusive listing agent as

described in the HBA was an "obligation [that] runs with the Property[.]" (Compl. Ex. 21.)

62.     N.C.G.S. § 1-116(a) governs the filing of a *lis pendens* in North Carolina and sets out the exclusive list of circumstances in which a *lis pendens* is proper.

(a) Any person desiring the benefit of constructive notice of pending litigation must file a separate, independent notice thereof, which notice shall be cross-indexed in accordance with G.S. 1-117, in all of the following cases:

(1) Actions affecting title to real property.

(2) Actions to foreclose any mortgage or deed of trust or to enforce any lien on real property.

(3) Actions in which any order of attachment is issued and real property is attached.

(4) Actions seeking injunctive relief under G.S. 113A-64.1 or G.S. 113A-65 regarding sedimentation and erosion control for any land-disturbing activity that is subject to the requirements of Article 4 of Chapter 113A of the General Statutes.

(5) Actions for asset freezing or seizure under G.S. 14-112.3.

N.C.G.S. § 1-116(a).

63.     Earlier in this litigation, Defendants took the position that the filing of a *lis pendens* was authorized under N.C.G.S. § 1-116(a)(1) on the theory that the HBA affected title to real property. However, this contention is meritless given that the limited nature of the contractual arrangement created by the HBA cannot reasonably be said to affect title to the property. Such a conclusion is consistent with applicable case law from North Carolina's appellate courts. *See, e.g., Parker v. White*, 235 N.C. 680, 688 (1952) ("[I]t is clear from a reading of the complaint, and the amendments

thereto, that this is an action to recover monetary damages. . . . Hence, the action is not one affecting the title to real property within the purview of G.S. § 1-116."); *Horney v. Price*, 189 N.C. 820, 825 (1925) ("The rule of *lis pendens* . . . does not apply to an action merely seeking to recover a money judgment, nor to any other action which does not directly affect property."); *Doby v. Lowder*, 72 N.C. App. 22, 29 (1984) ("The nature of plaintiffs' action . . . must be determined by reference to the facts alleged in the body of the complaint. This is an action for a money judgment. It does not seek to set aside a transfer of realty. In such a case, the filing of a notice of *lis pendens* is not authorized." (cleaned up)).

64.     In any event, Defendants appear to have abandoned this argument. In their response brief to the present Motion for Summary Judgment, the only argument they make is that the State failed to place in the summary judgment record each of the actual *lis pendens* that were filed against the properties of North Carolina homeowners (or the complaints that were filed in the individual breach of contract lawsuits that gave rise to each *lis pendens*). As a result, they contend, the Court is unable to rule on the validity or invalidity of each *lis pendens* when viewed in light of the specific circumstances of each lawsuit.

65.     The Court rejects this argument. In the present case, the State does not seek to litigate the issue of whether each affected homeowner actually breached the HBA that they had previously signed. Rather, the State is contending that Defendants' pattern and practice of filing a notice of *lis pendens* based solely on a homeowner's alleged breach of a contract for personal services constituted an unfair

or deceptive act. As a result, it was not necessary for the State to submit copies of each *lis pendens* or of the accompanying complaints in the breach of contract lawsuits.

66. As conceded by Defendants' counsel at the 29 July hearing, documents produced by Defendants during discovery (and submitted to the Court by the State) show that at least twenty-four notices of *lis pendens* were filed against North Carolina homeowners by Defendants. (*See* Ex. 13, ECF No. 167.13; 29 July Hr'g Tr. at 89, line 13.)

67. Accordingly, the Court concludes that no genuine issue of material fact exists as to whether Defendants committed an unfair or deceptive trade practice each time they filed a notice of *lis pendens* on the property of a North Carolina homeowner based on an alleged violation of an HBA, and summary judgment is **GRANTED** for the State on this issue.

## C. Early Termination Fees as Unenforceable Penalties

68. Finally, the State contends that MV Realty's pattern and practice of collecting an ETF from homeowners alleged to have breached their HBA constituted an unfair or deceptive trade practice. In making this argument, the State contends that the ETF amounted to an unlawful penalty. MV Realty, conversely, contends that the ETF served as a valid form of liquidated damages.

69. As discussed above, subject only to minimal exceptions, the HBA entitled MV Realty to recover from the homeowner an ETF upon any "sale or other transfer [of the home] that does not result in [ ] [MV Realty] being paid [a] [c]ommission[,]"—that is, any sale of the home by anyone other than an MV Realty

listing agent. (Sample HBA at 2.) The amount of the ETF is calculated based upon the greater of the value of the home at the time the HBA is signed or its value at the time the HBA is breached. (Sample HBA at 2.)

70. "It is well established that a sum specified in [a] contract as the measure of recovery in the event of a breach will be enforced if the court determines it to be a provision for liquidated damages but not enforced if it is determined to be a penalty." *KNC Techs., LLC v. Tutton*, 2021 NCBC LEXIS 38, at *42 (N.C. Super. Ct. Apr. 8, 2021) (cleaned up).

71. Our Supreme Court has explained as follows how this distinction should be applied:

> A stipulated sum is for liquidated damages only (1) where the damages which the parties reasonably anticipate are difficult to ascertain because of their indefiniteness or uncertainty and (2) where the amount stipulated is either a reasonable estimate of the damages which would probably be caused by a breach or is reasonably proportionate to the damages which have actually been caused by the breach.

*Knutton v. Cofield*, 273 N.C. 355, 361 (1968) (cleaned up).

72. "Whether the liquidated amount is a reasonable prior estimate of damages is determined by the status of the parties at the time of [the] making [of] the contract." *E. Carolina Internal Med., P.A. v. Faidas*, 149 N.C. App. 940, 946, *aff'd per curiam*, 356 N.C. 607 (2002). Our Court of Appeals has held that "[i]n determining whether a fixed sum, described by the contract as a measure of recovery in the event of breach, is a liquidated damage or perhaps an unenforceable penalty, this Court will consider the nature of the contract, the intention of the parties, and the sophistication of the parties." *Majestic Cinema Holdings, LLC v. High Point*

*Cinema*, 191 N.C. App. 163, 167 (cleaned up), *disc. rev. denied*, 362 N.C. 509 (2008). "The party seeking to invalidate a liquidated damages clause bears the burden of proving the provision is invalid." *WFC Lynnwood I LLC v. Lee of Raleigh, Inc.*, 259 N.C. App. 925, 929 (2018).

73.     Defendants argue that the first prong of this test is satisfied because the amount of the ETF is tied to the fair market value of the property at the time the breach of the HBA occurs, which amount could not be reasonably ascertained at the time the HBA is originally entered.

74.     This argument lacks merit.  As noted above, in order for a stipulated damages amount to be deemed a valid liquidated damages provision, the damages reasonably anticipated by the parties must be "difficult to ascertain because of their indefiniteness or uncertainty." *Knutton*, 273 N.C. at 361; *see also Ledbetter Bros. Inc. v. N.C. Dep't of Transp.*, 68 N.C. App. 97, 106 (1984).  Here, conversely, the calculation of the damages recoverable by MV Realty in the case of a homeowner's breach of an HBA would be simple to calculate—a proposition that MV Realty has failed to persuasively counter.[9]  *See Knutton*, 273 N.C. at 361 (in determining whether a stipulated sum is a valid liquidated damages provision or an unlawful penalty, "the courts have been greatly influenced by the fact that in almost all [ ] cases [ ] damages are uncertain and very difficult to estimate").

---

[9] Although the HBA contains language reciting that the parties agree that the damages from a breach would be difficult to ascertain because of indefiniteness or uncertainty, the Court is not bound by the parties' characterization of the payment in determining the enforceability of the provision. *See, e.g.*, *United Ord. of Am. Bricklayers & Stone Masons Union v. Thorleif Larsen & Son, Inc.*, 519 F.2d 331, 333 (7th Cir. 1975) ("[U]se of the term 'liquidated damages' . . . is not conclusive[.]" (citations omitted)).

75.     Indeed, in *Knutton,* the Supreme Court expressly observed that the ability to measure damages by reference to market value causes the damages amount for a breach to be ascertainable.

> Where the damages resulting from a breach of contract cannot be measured by any definite pecuniary standard, *as by market value or the like*, but are wholly uncertain, the law favors a liquidation of the damages by the parties themselves; and where they stipulate for a reasonable amount, the agreement will be enforced.

*Id.* at 362 (emphasis added); *see also Starling v. Sproles*, 69 N.C. App. 598, 602 (1984) (holding that "[t]he measure of damages for breach of contract to convey land is the difference between the contract price and the market value of the land" (cleaned up)).

76.     Several courts in other jurisdictions have rejected Defendants' logic on this issue.[10]  *See, e.g.*, *Kellam v. Hampton*, 58 Tex. Civ. App. 484, 487 (1910) ("where the loss or injury may be easily determined by proof of market values the sum will be regarded as a penalty and not as liquidated damages."); *see also Pac. Dock & Terminal v. L.A. Dock & Terminal Co.,* 50 F.2d 557, 566 (9th Cir. 1941) (holding that "the market value of real estate is practically always capable of exact ascertainment").

77.     Furthermore, as noted above, the relative sophistication of the parties is a factor to be considered by a court in determining whether such a contractual provision is valid.  Here, this factor also weighs against the enforceability of the ETF provision.  The homeowners who participated in the HBA program were consumers

---

[10] It is well settled that North Carolina courts may consider case law from other jurisdictions as persuasive authority.  *See, e.g.*, *Sykes v. Health Network Sols., Inc.*, 2018 NCBC LEXIS 29, at *8 (N.C. Super. Ct. Apr. 5, 2018).

who were being asked to sign a pre-printed form that was drafted by MV Realty (a sophisticated commercial enterprise) under "take it or leave it" circumstances.

78.     Finally, although not dispositive on this issue, the Court notes that in earlier versions of the HBA, the ETF was expressly referred to as a "penalty" by MV Realty itself.  (*See, e.g.*, Compl., Exs. 1, 13, 19, 20.)  A prior version of the HBA stated in large, capitalized boldface print, as follows: "**THIS AGREEMENT PROVIDES FOR A PENALTY FOR EARLY TERMINATION AS SET FORTH IN THIS SECTION 3**."    (Compl., Ex. 1 (emphasis in original).)    Although MV Realty subsequently removed this language from its standard HBA, the substantive terms that MV Realty itself had previously described as a "penalty" did not change in the new version of the HBA.  (Sample HBA at 2.)

79.     A Georgia court recently reached a similar conclusion as to the punitive nature of the ETFs.

> MV Realty's ETF was intended to penalize consumers, as demonstrated by MV Realty's characterization of the HBAs to investors and how it went about enforcing its HBAs, i.e. by filing foreclosure actions and lis pendens against Georgia consumers.

*State ex rel. Carr v. MV Realty PBC, LLC*, Case No.  24CV001338, ¶ 49 (Fulton Cnty. Super. Ct. Aug. 28, 2025).

80.     For these reasons, the Court concludes that no genuine issue of material fact exists as to whether Defendants committed an unfair or deceptive trade practice each time it collected an ETF from a North Carolina homeowner, and summary judgment is **GRANTED** in favor of the State on this issue.

## II.     Telephone Solicitation Act

81. The State advances two theories in support of its contention that Defendants violated North Carolina's Telephone Solicitation Act ("TSA"). First, the State contends that Defendants improperly called homeowners whose phone numbers were listed on the "Do Not Call" Registry without first obtaining proper consent to do so. Second, the State asserts that Defendants violated statutory restrictions regarding calls involving the use of automatic dialing and recorded message players.[11]

82. The Court will first address Defendants' contention that any calls made by MV Realty to homeowners on the "Do Not Call Registry" did not violate North Carolina's TSA because MV Realty does not meet the statutory definition of a "telephone solicitor." Next, the Court will consider Defendants' argument that the prerecorded calls it made to homeowners were not robocalls as defined under the TSA. Finally, the Court will evaluate Defendants' contention that the homeowners at issue consented to receiving the challenged calls.

## A. Calls to Homeowners on the Do Not Call Registry

83. The Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, was promulgated by the Federal Trade Commission pursuant to a directive of Congress to enact regulations designed to prohibit abusive and deceptive telemarketing practices. *See* 15 U.S.C. §§ 6101–6108.

---

[11] For ease of reference, the Court will refer to the latter category of calls by the colloquial term "robocalls."

84. The "Do Not Call" Registry is a national registry created and maintained by the Federal Trade Commission pursuant to the Telemarketing Sales Rule. N.C.G.S. § 75-101(3).

85. N.C.G.S. § 75-102 provides in pertinent part as follows:

Except as provided in G.S. 75-103, no telephone solicitor shall make a telephone solicitation to a telephone subscriber's telephone number if the telephone subscriber's telephone number appears in the latest edition of the "Do Not Call" Registry.

N.C.G.S. § 75-102(a).

86. A "telephone solicitation" in North Carolina is defined as

[a] voice or text communication whether prerecorded, live, or a facsimile, over a telephone line or wireless telephone network. . . that is made by a telephone solicitor to a telephone subscriber for the purpose of soliciting or encouraging the purchase. . . of. . .services. . . . "Telephone solicitation" also includes those transactions that are defined as "telemarketing" under the Telemarketing Sales Rule.

N.C.G.S. § 75-101(9).

87. A "telephone solicitor" is, in turn, defined as

[a]ny individual, business establishment, business, or other legal entity doing business in this State that, directly or through salespersons or agents, makes or attempts to make telephone solicitations or causes telephone solicitations to be made. "Telephone solicitor" also includes any party defined as a "telemarketer" under the Telemarketing Sales Rule.

N.C.G.S. § 75-101(10).

88. Pursuant to N.C.G.S. § 75-103(e), a telephone solicitor has the burden of proving that a telephone subscriber on the "Do Not Call" Registry has provided an "express invitation or permission" by producing the original document, facsimile

document, or an electronic form evidencing the telephone subscriber's consent.  N.C. G.S. § 75-103(e).

89.     The State alleges that MV Realty—operating as a "telephone solicitor"— violated the TSA by making thousands of unlawful calls (telephone solicitations) to homeowners who were listed on the "Do Not Call" Registry and who did not give prior consent to receive such calls.

90.     Specifically, the State argues that the undisputed evidence in this case shows that MV Realty initiated 149,983 calls to North Carolina phone numbers on the "Do Not Call" Registry.  (Pl.'s SJ Mot., Ex. 16, 25.)

91.     In response, Defendants contend that MV Realty does not qualify as a "telephone solicitor" because, as noted above, N.C.G.S. § 75-101(9) defines telephone solicitations as those communications that are made "for the purpose of soliciting or encouraging the purchase. . . of services."

92.     In support of this argument, Defendants take the position that MV Realty was not selling a service or a product through the HBA program and was instead providing monetary payments *to the homeowner* (rather than vice-versa) in consideration for MV Realty's right to serve as the homeowner's broker in connection with a future sale of the home over the next forty years.

93.     The Court is unable to agree with this argument.  Under the HBA, the homeowner entered into a contract for the contingent provision of future real estate listing services.  In so doing, each homeowner provided consideration to MV Realty by entering into a forty-year contract that resulted in a cloud on the title to their

properties and subjected them to being forced to pay an ETF if they were to breach the HBA.

94.     The entire purpose of the HBA was not the payment of the upfront money to the homeowner but rather to lock the homeowner into a contractual relationship with MV Realty that would last four decades based on terms that violate North Carolina law.  The HBA contemplated that services would be "purchased" by the homeowner and provided by MV Realty at some point during those forty years.

95.     A federal court in North Carolina recently rejected an analogous argument by a defendant, stating the following:

> In evaluating whether or not a call is a "solicitation," the Court examines the content and context of the message while using "a measure of common sense."  The content of the message offers RFC's financial services as a means to save consumers money.  Defendant claims that plaintiff's complaint was conclusory.  However, from the context, it is clear that the message was meant to elicit a business transaction between the recipient and RFC.  Therefore, plaintiff's allegations are sufficient to show solicitation.

*Davis v. Reliance First Cap., LLC*, 2023 U.S. Dist. LEXIS 24055, at *9–10 (E.D.N.C. Feb. 13, 2023) (cleaned up).

96.     Utilization of such a commonsense approach here results in a similar conclusion.[12]  As a result, the Court finds that MV Realty meets the statutory definition of a "telephone solicitor."

---

[12] Although not dispositive on this issue, the Court notes that contained in the record (Pl.'s Reply Br. Supp. P.I., Ex. 8, ECF No. 39.8) is a document from MV Realty's internal training materials titled "DO NOT CALL POLICY" that states "[a] telephone solicitation call' means any call that is made for the purpose of encouraging the purchase of products and services from MV Realty."

97.     As a result, no genuine issue of material fact exists as to whether Defendants made calls to North Carolina homeowners who were on the "Do Not Call" Registry as a "telephone solicitor" for purposes of N.C.G.S. § 75-102.

**B.      Robocalls**

98.     North Carolina law generally prohibits the use of "an automatic dialing and recorded message player to make an unsolicited telephone call."  N.C.G.S. § 75-104(a).

99.     By statute, the term "automatic dialing and recorded message player" is defined as

> [a]ny automatic equipment that incorporates a storage capability of telephone numbers to be called or a random or sequential number generator capable of producing numbers to be called that, working alone or in conjunction with other equipment, disseminates a prerecorded message to the telephone number called.

N.C.G.S. § 75-101(2).

100.    The State has offered evidence that MV Realty made 344,009 robocalls to North Carolina homeowners as part of the marketing scheme for its HBA program. (Pl.'s Br. Supp. Mot. Summ. J., Ex. 16, 25.)

101.    Defendants, conversely, argue that the calls they made were materially different from those defined in N.C.G.S. § 75-101(2) based on MV Realty's utilization of third-party vendors and the existence of human interaction for those calls.  They contend that these features of their calls render them materially distinguishable from the types of calls identified in § 75-101(2).

102.    It is undisputed that in connection with these calls, MV Realty used the PhoneBurner platform, a cloud-based service that allowed MV Realty to import and store lead contact information.  In addition to storing lead contact information, PhoneBurner also dialed stored phone numbers for leads.  (Manchester Decl. ¶¶ 16–17, 19.)

103.    Defendant David Manchester, the Chief Operating Officer of MV Realty PBC, LLC, testified that PhoneBurner only dials a lead when it is prompted to do so by an MV Realty employee or agent (either a "transfer specialist" or a real estate agent) and that those persons actually initiated the calls to leads within the PhoneBurner platform.  He also testified that once a phone call is complete, the system prompts the agent to dial the following number in the lead queue.  Manchester further testified that PhoneBurner's voicemail feature did not function as an automated call; instead, he stated, an MV Realty agent needed to initiate a voicemail drop.  (Manchester Decl. ¶¶ 2, 19–22.)

104.    The State argues in response that this aspect of Manchester's testimony proves that Defendants' use of the PhoneBurner platform places these calls squarely within the statutory framework of N.C.G.S. §§ 75-101(2) and 75-104.  Specifically, the State notes that the storage prong of the statutory definition is satisfied because—as Manchester testified—PhoneBurner allows its users to import and store phone numbers to be called.  (Manchester Decl. ¶ 17.)  Furthermore, Manchester testified that MV Realty used PhoneBurner to leave voicemail messages when a lead did not answer a call and that once a voicemail message was left, PhoneBurner prompted the

Defendants' agent to move to the next lead to be contacted. (Manchester Decl. ¶¶ 20–22.)

105. The Court finds the State's arguments on this issue to be persuasive.

106. Defendants also contend that the PhoneBurner platform's functionality requires a human agent's action and judgment (namely, the action of an agent in initiating a phone call and leaving a voicemail message for non-responsive contacts) and that this human participation in the process takes these calls outside the scope of N.C.G.S. §§ 75-101(2) and 75-104.

107. However, the definition of "automatic dialing and recorded message player" set out in N.C.G.S § 75-101(2) does not identify the absence of human participation as a necessary factor in order for the definition to be met.

108. The Court also finds the United States Supreme Court's decision in *Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021), to be instructive on this general issue.

> Duguid contends that ordinary cell phones are not autodialers under his interpretation because they cannot dial phone numbers automatically and instead rely on human intervention. But all devices require some human intervention, whether it takes the form of programming a cell phone to respond automatically to texts received while in "do not disturb" mode or commanding a computer program to produce and dial phone numbers at random. We decline to interpret the TCPA as requiring such a difficult line-drawing exercise around how much automatic is too much.

*Id.,* 592 U.S. at 408 n.6.

109. Thus, the Court concludes that no genuine issue of material fact exists on the question of whether MV Realty made calls encompassed by N.C.G.S. §§ 75-101(2) and 75-104.

## C. Consent Issue

110. The Court has now determined that the evidence of record establishes as a matter of law that Defendants did, in fact, make both (1) calls to homeowners whose phone numbers were listed on the "Do Not Call" Registry; and (2) robocalls as defined under the applicable North Carolina statutes.

111. Therefore, the entry of summary judgment in favor of the State would be appropriate on both theories underlying its TSA claims unless Defendants can show that a genuine issue of material fact exists as to their defense that all such calls were made only to persons who had previously given consent to receive them.

112. Although consent would, in fact, be a valid defense to both of the State's theories of recovery under the TSA, North Carolina law provides that a telephone solicitor bears the burden to demonstrate that consent existed at the time the phone calls at issue were made, *see* N.C.G.S. § 75-103(e), and the Court finds that Defendants have failed to meet this burden.

113. Defendants argue that they have sufficiently demonstrated that consent was given for the phone calls at issue. Defendants maintain that the lead generator vendors from whom MV Realty purchased the names and contact information for homeowners likely to be interested in the HBA program obtained the required consents on MV Realty's behalf. (Manchester Decl. ¶¶ 4–10.)

114. Manchester testified that the lead generators provided MV Realty with "the customer's time-stamped contact information as well as the unique IP address from which the consumer gave consent for MV Realty to communicate with them,

which included consent to be contacted through automated means if MV Realty chose to do so." (Manchester Decl. ¶ 11.)

115. MV Realty also asserts that it contracted with a company called Journaya, a third-party data storage provider, to maintain these records of consent obtained by the lead generators. (Manchester Decl. ¶ 12.)

116. Defendants contend that Journaya's practice was to digitally store these records (detailing each customer call) with data fields including the date each homeowner was contacted, other call details, and a record of the consumer's consent to be contacted. According to Defendants, Journaya then reduced this data into discrete digital records that they refer to as "tokens."

117. However, there is a disconnect between the arguments advanced by Defendants on this issue and the evidence that they have produced in opposing the State's summary judgment motion. In fact, the only Journaya-related evidence in the record relates to merely *two* homeowners.

118. At the 29 July hearing, in response to repeated questioning from the Court as to why there were not significantly more Journaya documents in the record to support Defendants' consent argument, counsel for MV Realty failed to provide a satisfactory response—merely hinting that it would have been cost-prohibitive for MV Realty to obtain such additional documentation. (29 July Hr'g Tr. at 121, lines 1–7.) Obviously, however, the Court cannot rely on evidence that is not actually in the record based simply upon counsel's representation that it exists.

119.    Moreover, the State has offered detailed testimony from its expert witness, Jasper Van Beusekom, as to the deficiencies with Defendants' contentions regarding the consent issue.  Defendants have not designated an expert witness of their own and instead seek to rely on the Declaration of Manchester on this subject. (Manchester Decl.)  The State, in turn, has filed a motion to strike certain portions of Manchester's Declaration on the grounds that they are inadmissible in that they contain information outside of his own personal knowledge, merely state legal conclusions, and at times contradict his prior testimony in this case.

120.    Rule 56(e) of the North Carolina Rules of Civil Procedure provides that affidavits filed in support of or in opposition to a motion for summary judgment

> shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

N.C.G.S. § 1A-1, N.C.R. Civ. P. 56(e).

121.    This Court has noted that

> [a]n affidavit must be based on personal knowledge, and its allegations should be of the pertinent facts and circumstances, rather than conclusions.  A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter.  Thus, statements in affidavits as to opinion, belief, or conclusions of law are of no effect.

*W&W Partners, Inc. v. Ferell Land Co., LLC*, 2019 NCBC LEXIS 104, at *4 (N.C. Super. Ct. Dec. 6, 2019) (cleaned up); *see also rFactr, Inc. v. McDowell,* 2023 NCBC LEXIS 18, at *22 (N.C. Super. Ct. Jan. 27, 2023) ("It is axiomatic that evidence contained in affidavits or declarations that would be inadmissible at trial must

be stricken and cannot be considered by the Court in rendering summary judgment." (cleaned up)).

122. Moreover, it is well established that a "party opposing a motion for summary judgment cannot create a genuine issue of material fact by filing an affidavit contradicting his prior sworn testimony." *Pinczkowski v. Norfolk S. Ry. Co.*, 153 N.C. App. 435, 440 (2002).

123. In support of its Motion to Strike, the State argues that Manchester inappropriately testified that North Carolina homeowners gave express consent to receiving contact from MV Realty and that he reached this conclusion based on his "personal knowledge" of Defendants' business operations and how they used lead generators. (Manchester Decl. ¶¶ 1, 4–8.) The State contends that the evidence of record in this case rejects the proposition that Manchester has personal knowledge of which North Carolina homeowners may have actually consented to receive calls from MV Realty. Indeed, Michael Bolek, a Senior Manager with MV Realty, testified that MV Realty was simply "operating under the expectation that consent was being collected" by the third-party lead generators. (Bolek Dep., at 65, ECF No. 177.1.)

124. Additionally, although Manchester testified that a spreadsheet provided to the State by MV Realty with 260,0000 columns of data "constituted evidence of consent[,]" (Manchester Decl. ¶¶ 14–15), Defendants' own corporate representative, Antony Mitchell, testified in his Rule 30(b)(6) deposition that the data fields in the spreadsheet "are meaningless pieces of code" (Mitchell Rule 30(b)(6) Dep. at 209, ECF No. 167.19.).

125. The State further takes issue with Manchester's testimony regarding various aspects of PhoneBurner's operations, including his statement that after reviewing PhoneBurner's website, he concluded that "PhoneBurner is not a robocalling technology or a predictive dialer." (Manchester Decl. ¶¶ 17, 20.) This assertion, the State argues, is merely a legal conclusion. In addition, the State cites Manchester's prior deposition testimony that he had never actually used the PhoneBurner platform. (Manchester Dep. at 66, ECF No. 167.15.)

126. Based on the Court's careful review of the record and consideration of the arguments of counsel, the following italicized statements from his Declaration are hereby stricken:

> 4. During the course of its business, MV Realty contacted individuals through phone calls, whose phone numbers and contact information it obtained from various third-party lead generators *after those individuals explicitly consented to MV Realty contacting them*.

> 5. To facilitate this, MV Realty used reputable lead providers, like the Wisdom Company, Powers Company, Lead Lead, PX, the Leads Warehouse, and Landfall (collectively, "Lead Generators"), [sic] connected MV Realty with individuals *who explicitly consented to receiving communications from MV Realty*.

> . . .

> 9. *Obtaining consent from individuals before selling leads, especially when it comes to personal information like phone numbers, is not just ethical but also legally mandated for the Lead Generators MV Realty bought leads from.*

> 10. *The consent obtained by the Lead Generators and included in the records provided to Plaintiff, evidence the consumer's interactions on the website where they submitted their contact information and consented to MV Realty contacting them.*

11.     When Lead Generators provided MV Realty with the contact information for any particular lead, the Lead Generator provided MV Realty with the customer's time stamped contact information *as well as the unique IP address from which the consumer gave consent for MV Realty to communicate with them, which included consent to be contacted through automated means if MV Realty chosen* [sic] *to do so.*

. . .

14.     Specifically, MV Realty produced a large volume of information comprised of more than 260,000 columns of information relating to phone numbers with North Carolina area codes which were called by MV Realty, the majority of which were obtained from Lead Generators and some of which were obtained as a result of direct outreach to MV Realty by prospective customers *who also gave direct conset* [sic] *to MV Realty via its own website.*

15.     Each time-stamped IP address associated with any particular individual on the above referenced spreadsheet, is a unique numerical identifier that represents a device or network on the internet particular to the individual North Carolina resident *which together with the consumer's phone number evidences consent.* It is like a digital address for an individual's device *from which consent was provided*, be it a computer or mobile device—all of which have a unique IP address to be recognized and communicate [sic].

. . .

20.     Once a call finishes, the system prompts the individual making the call can [sic] to dial the next number on the list, thus minimizing downtime that occurs with traditional individual digit input dialing methods. *PhoneBurner is not a robocalling technology or predictive dialer.*

. . .

23.     *"Automated calls" refer to situations where a system automatically dials numbers and delivers messages or information without direct human intervention (i.e. robocalls).* In contrast, PhoneBurner initiates and terminates all calls only with human interaction.

24.     *Even if a potential HBA customer had already opted-in or consented to receiving communications from MV Realty, when a call recipient*

*requested not to be contacted again, the agent or transfer specialist would comply and place them on MV Realty's internal do-not contact list.*

(Manchester Decl. ¶¶ 4-5, 9–11, 14–15, 20, 23–24) (emphasis added).)

127. It is clear from the record that Manchester lacks personal knowledge of consent actually being obtained from homeowners by MV Realty's third-party vendors, and as a result, the statements contained in paragraphs 4–5, 10, 11, 14, and 15 representing that such consent was actually obtained is inadmissible. In addition, paragraphs 9, 20, and 23 contain legal conclusions that likewise fail to meet admissibility requirements under Rule 56(e). Finally, there is no indication Manchester possesses personal knowledge of the actions of the third-party vendors set out in paragraph 24.

128. Therefore, the State's Motion to Strike is **GRANTED** as to these portions of Manchester's declarations, and its Motion to Strike is otherwise **DENIED**. The Court further concludes that Defendants have failed to show the existence of a genuine issue of material fact as to whether consent was obtained by MV Realty (or its agents) from the North Carolina homeowners who received calls despite having placed their phone numbers on the "Do Not Call" Registry or who received robocalls.

129. For all of the reasons set forth above, the Court concludes that no genuine issue of material fact exists on the issue of whether Defendants violated the TSA both by unlawfully making calls to homeowners whose phone numbers were listed on the "Do Not Call" Registry and by making robocalls. Accordingly, the State's Motion for Summary Judgment is **GRANTED** as to its claims under the TSA.

## III. Liability of Named Defendants

130. As noted above, the State has brought this action against seven Defendants. Three of the Defendants are entities, and four of them are natural persons.

### A. Entity Defendants

131. The following entities are Defendants in this action: MV Realty PBC, LLC; MV Realty of North Carolina, LLC; and MV Brokerage of North Carolina, LLC.

132. In their response brief, Defendants have not made specific arguments as to why any of these three entities should not be held liable in the event the Court determines that the State has shown as a matter of law that the operation of the HBA program against North Carolina homeowners resulted in unfair or deceptive trade practices or violations of the TSA. Therefore, the Court need not address the specific roles each of these entities played in the operation of the HBA program in North Carolina.

133. Instead, Defendants contend that the State has failed to show any actual injury that was suffered as a result of Defendants' conduct. This argument is meritless.

134. The record is clear that numerous North Carolina homeowners were forced to pay ETFs for alleged breaches of the HBA, that at least twenty-four homeowners had notices of *lis pendens* unlawfully placed on their homes, and that the filing of the Memoranda created a cloud on the titles of multiple homeowners'

properties. Moreover, the State has shown that thousands of North Carolina residents received unlawful phone calls or robocalls in violation of the TSA.

135. The Court concludes that these facts are easily sufficient to show actual injury stemming from the acts of Defendants discussed throughout this Opinion.

## B. Individual Liability

136. The individual Defendants named in the State's Complaint are Antony Mitchell, David Manchester, Amanda Zachman, and Darryl Cook.

137. Defendants broadly assert that individual liability cannot exist under North Carolina law for the State's claims in this action (even if liability exists as to the entity Defendants). However, this argument is not legally supportable.

138. Our Court of Appeals has held that

[j]oint and several liability is allowed when (1) defendants have acted in concert to commit a wrong that caused an injury; or (2) defendants, even without acting in concert, have committed separate wrongs that still produced an indivisible injury. Concerted action is when "two or more persons unite or intentionally act in concert in committing a wrongful act, or participate therein with common intent." *Garrett v. Garrett*, 228 N.C. 530, 531 (1948).

*GE Betz Inc., v. Conrad*, 231 N.C. App. 214, 235 (2013) (cleaned up).

139. In *Rich Food Servs., Inc.*, 139 N.C. App. 691 (2000), our Court of Appeals expressly held that the Attorney General can seek the imposition of both criminal and civil liability under Chapter 75 of the North Carolina General Statutes against not only corporations but also against their agents, officers, and employees.

N.C. Gen. Stat. § 75-9, which sets out the broad authority of the Attorney General to investigate possible violations of Chapter 75, provides in part that it is the duty of the Attorney General to "investigate . . . the affairs of all corporations or persons doing business in this State . . . in violation

of law . . . ." *Id.* The purpose of such investigation is to "acquire such information as may be necessary to enable him to prosecute any such corporation, *its agents, officers and employees* for crime, or prosecute civil actions against them if he discovers they are liable and should be prosecuted." *Id.* (emphasis added).

The plain language of the statute allows the Attorney General to prosecute "agents, officers and employees" of corporations in either criminal or civil actions. Further, it is unlikely that the Legislature would have authorized the Attorney General to investigate "persons," without intending that such "persons" might be held to answer for their violations of Chapter 75.

*Rich Food Servs., Inc.,* 139 N.C. App. at 705; *see also Baker v. Rushing*, 104 N.C. App. 240, 247 (1991) ("[A] person is personally liable for all torts committed by him, notwithstanding that he may have acted as an agent for another or as an officer for a corporation.").

140. Furthermore, the Court finds that the TSA likewise contemplates individual liability. For example, N.C.G.S. § 75-104 applies to "persons" who use automatic dialing and recorded message players, and N.C.G.S. § 75-101(7) defines the term "person" as "any *individual*, business establishment, business, or other legal entity." (emphasis added)

141. Defendants have failed to make any specific arguments in their response brief suggesting that the State failed to meet its burden under Rule 56 of establishing that the named individual Defendants were sufficiently involved in the HBA program so as to warrant the imposition of individual liability against them.

142. The Court is satisfied that the evidence of record supports the State's arguments regarding the individual liability of these Defendants.

143. The HBA program was primarily designed by Mitchell, the Chief Executive Officer of MV Realty PBC, LLC, and an officer of MV Realty of North Carolina, LLC. (Mitchell Dep. at 21–23, 49–53; Mitchell Adv. Pro. Dep. at 35–38; Mitchell Adv. Pro. Dep. II at 208–10, ECF No. 167.38.) Mitchell also developed specific features of the HBA program, including the promotion fee, the forty-year term, the filing of the Memoranda, and the commission structure. (Mitchell Adv. Pro. Dep. II at 208; Mitchell Dep. at 59–60; Mitchell Rule 30(b)(6) Dep. at 23, 180.) Mitchell was personally involved with the use of the Memoranda, and his signature appears on documents filed in various North Carolina Register of Deeds offices. (Mitchell Rule 30(b)(6) Dep. at 202–04; Ex. 39, ECF No. 167.39.) In addition, as an MV Realty executive, Mitchell had control over the Defendants' telemarketing campaigns and legal compliance. (Mitchell Dep. at 125–38; Mitchell Rule 30(b)(6) Dep. at 9, 208–13; Zachman Dep. at 29, 90, ECF No. 167.20.)

144. Manchester is the Chief Operating Officer of MV Realty PBC, LLC. In that role, he helped create and implement the HBA program and the attendant business strategy. (Manchester Dep. at 32–34, 36–38; Mitchell Adv. Pro. at 51–57, ECF No. 167.40.) He was also heavily involved with the company's marketing efforts. (Manchester Dep. at 41–44, 57–58, 68, 144; Manchester Adv. Pro. Dep. at 40, 52.) In addition, Manchester was personally involved in the company's North Carolina operations, handling customer matters that required management intervention. (Manchester Dep. at 106–12; ECF No. 167.42.) Manchester also took the lead in human resources duties for MV Realty. He hired "transfer specialists" and had

primary responsibility for agent training and the development of training materials. (Manchester Dep. at 41–44, 57–58, 94–95; Zachman Dep. at 28–30, 40.)

145. Zachman founded MV Realty PBC, LLC in 2014 and serves as its managing director and as a corporate officer. (Zachman Dep. at 15–18.) She is the corporate secretary of MV Realty of North Carolina, LLC. (MV Realty Operating Agreement, at 5.) Zachman supervised MV Realty of North Carolina, LLC's legal department and managed the company's listing operations. (Zachman Dep. at 17, 32.) She was significantly involved with individual North Carolina homeowners, as she sent breach notices and approved the filing of *lis pendens.* (Zachman Dep. at 107, 109, 117–18; ECF No. 167.43.) She also executed—as an agent for MV Realty of North Carolina, LLC—thousands of HBAs and recorded Memoranda in North Carolina. (Zachman Dep. at 100–07; ECF No. 32.13.)

146. Cook was the Broker in Charge for MV Realty of North Carolina, LLC, until 2023. (Real Estate Commission Order ¶ 5.) In this role, he used his personal residence as the corporate address for the Defendant entities. (Cook Dep. at 45–47, ECF No. 167.45.) He supervised the North Carolina agents for MV Realty and acted as an agent himself. (Cook Dep. at 36, 174–75.)

147. Thus, each of the individual Defendants played a substantial part in the operations of MV Realty that form the basis for the State's summary judgment motion.

148. The Court notes that a Florida trial court recently addressed similar claims asserted by that state's attorney general against Mitchell, Manchester, and

Zachman regarding MV Realty's HBA program. In *Office of Atty Gen., Dep't of Legal Affs. v. MV Realty, PBC, LLC,* No. 22-CA-9958 (13th Cir. Sept. 24, 2024), the court entered an order granting partial summary judgment in favor of the attorney general, finding, *inter alia*, that MV Realty had violated Florida's Deceptive and Unfair Trade Practices Act and entering summary judgment in favor of the attorney general on his claims against Zachman, Mitchell, and Manchester individually. *Id.* at 10–11.

149.   In rejecting the individual defendants' argument that they could not be held liable under Florida law because they lacked the requisite "involvement, responsibility, or knowledge," *id.* at 8, the court stated the following:

> Each of the named Individual Defendants directly participated in the wrongful acts or practices and each is liable under FDUTPA. Each was directly involved in the planning, engineering, implementation, execution and other key aspects of the Homeowner Benefit Program, HBA, and Memoranda which the court separately found violative of FDUTPA as a matter of law. Further, all three Individual Defendants had the ability to control the respective conduct and practices that violate the Act within their spheres of responsibility.

*Id.*

150.   The same is true here. Accordingly, this Court's determination that the State is entitled to partial summary judgment as to its UDTP claims and full summary judgment as to its TSA claims applies equally to both the entity Defendants and to Mitchell, Manchester, Zachman, and Cook.

## IV. Permanent Injunctive Relief

151. For the reasons set out above, the Court concludes that the collection of ETFs pursuant to the HBA program against North Carolina homeowners is not permitted under North Carolina law. Likewise, the filing of the Memoranda as to North Carolina homeowners who participated in the HBA program and the filing of notices of *lis pendens* on the properties of such homeowners also violates North Carolina law.

152. Accordingly, Defendants are hereby permanently enjoined from (1) taking any action to collect any ETFs against North Carolina homeowners pursuant to the HBA program; (2) filing any Memoranda executed by North Carolina homeowners in connection with the HBA program; and (3) filing any notices of *lis pendens* affecting the properties of any North Carolina homeowners stemming from the HBA program.[13]

## V. Remedies

153. Finally, the State also seeks various forms of monetary relief against Defendants, including an award of restitution and civil penalties. However, the Court concludes that further proceedings are necessary in connection with those issues.

154. Therefore, the Court **DEFERS** ruling on the State's request for any monetary award against Defendants.

---

[13] The Court need not decide at the present time whether any remaining terms of the HBAs are legally enforceable.

## CONCLUSION

**THEREFORE, IT IS ORDERED** as follows:

1. Plaintiff's Motion for Partial Summary Judgment on its claims for UDTP is **GRANTED**.

2. Plaintiff's Motion for Summary Judgment on its claims under the TSA is **GRANTED**.

3. Plaintiff's Motion to Strike the Declaration of David Manchester is **GRANTED** in part and **DENIED** in part.

4. Defendants are hereby **PERMANENTLY ENJOINED** from (1) taking any action to collect any ETFs against North Carolina homeowners pursuant to the HBA program; (2) filing any Memoranda executed by North Carolina homeowners in connection with the HBA program; and (3) filing any notices of *lis pendens* affecting the properties of any North Carolina homeowners stemming from the HBA program.

5. The Court **DEFERS** ruling on the State's request for monetary relief, including restitution and civil penalties.

    **SO ORDERED**, this the 16th day of January, 2026.


/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases